[Crim. No. 2533.   First Dist., Div. One.   June 24, 1949.]

THE PEOPLE, Respondent, v. WALTER BROWER, Appellant.

Walter Brower, in pro. per., for Appellant.

Fred N. Howser, Attorney General, and David K. Lener, Deputy Attorney General, for Respondent.

BRAY, J.—Defendant was tried by a jury and found guilty of the crime of forgery. After denial of his motion for a new trial, he appealed from the judgment. At the trial and here defendant acted in propria persona.

He makes five contentions: (1) The information became void. (2) The court refused to let the codefendant Gross plead guilty. (3) He was not brought to trial within the time prescribed by law. (4) Errors in introduction of evidence. (5) The corpus delicti was not proved.

1. INFORMATION WAS NOT VOID

In the original information defendant was charged jointly with one Gross with the crime of forgery. On October 20, 1947, both defendants pleaded not guilty thereto. On December 4, both defendants were in court, represented by Attorney Klein. The clerk proceeded to arraign them on an amended information which apparently had been filed previously. (The record does not show when.) This information was the same as the original one except that a prior conviction against Brower alone had been added. To this amended information Gross pleaded guilty, Brower not guilty, admitting the prior conviction. The district attorney then asked the court to refuse to accept Gross's plea of guilty. In the discussion which ensued the court set aside the amended information on the ground that it was filed after plea to the original information, without leave of court. While the court used the language "set the whole thing aside" it is obvious from the discussion and the proceedings thereafter, including the fact that Brower at no time during the trial contended that the original information had been set aside, that the court was referring to the amended information and not to the original information. Defendant now contends that the amended information superseded the original information and when the court set it aside the original information was set aside also, and there was left no information upon which to try him. This contention is not well founded. Section 1008 of the Penal Code allows amendment of an information any time before plea without leave of court, but requires such leave to be obtained for an amendment after plea. The filing of the amended information without leave of court in nowise affected the original information, nor did its setting aside. This is elementary. Until the court had granted permission that it be filed, the amended information had no place in the record and was not legally filed. In *People* v. *Gates*, 214

Cal. 175 [4 P.2d 541], an information charging forgery was *properly* amended pursuant to section 969a of the Penal Code to set up a prior conviction. ''This amendment was later withdrawn and the original information remained. The defendant suffered no prejudicial error through such action and the original information did not lose its efficacy.'' This case, likewise, answers defendant's contention that once the court learned that defendant had a prior conviction, it had no right to refuse to allow the amendment. This contention is based upon the language of section 969a: ''Whenever it shall be discovered that a pending . . . information does not charge all prior'' convictions, said ''information shall be forthwith amended to charge'' such convictions. See, also, *People* v. *Grimes,* 94 Cal.App. 238 [270 P. 1000], where the court struck out of the information two of the three charges of prior conviction.

2. THE CODEFENDANT'S PLEA

██ As stated, Gross pleaded not guilty to the original information. He pleaded guilty to the amended information before the court set it aside. When the court set aside the amended information, the district attorney announced that he would file an amended information later. Apparently this was not done, although at the end of the presentation of evidence by the prosecution, the following occurred: ''MR. MULLINS [for the prosecution]: That is all. That is the People's case except on a motion for the amended information, which is under submission. THE COURT: That will remain under submission.'' The court did not act further on this matter and the judgment made no mention of the prior conviction. The record shows that on more than one occasion before trial, Gross asked that he be permitted to change his plea from not guilty to guilty. To this the district attorney objected and the court refused to allow the change. Brower contends that thereby he was forced to trial with an admittedly guilty .man and that the jury was influenced by evidence admissible against Gross alone, which could not have been before the jury had Brower been tried alone. Thus, Gross's confession, which was not admissible against Brower, was admitted. Although the court specifically instructed several times that this confession was not to be used against Brower, the district attorney in his argument read it to the jury, emphasizing the parts implicating Brower. The court erred in forcing Gross to stand trial where the only purpose

of so doing was to get before the jury evidence inadmissible against Brower. This practice is highly reprehensible. However, in this case we are forced to the conclusion that under section 4½ of article VI of the Constitution, the error was not prejudicial and did not result in a miscarriage of justice. Disregarding the confession entirely, the case is very strong against Brower. The facts will be discussed later on. They leave no reasonable doubt of defendant's guilt.

When Brower called Gross to the stand to testify, he stood on his constitutional rights and refused to do so. It is doubtful if this can be blamed on the prosecution. However, were there any reasonable doubt of Brower's guilt, the fact that Gross was compelled to stand trial against his own wish, so that his confession could be indirectly used against Brower, and that Gross then refused to give Brower an opportunity to examine him concerning the matters mentioned in the confession, would be important. But in view of the facts of the case, no miscarriage of justice resulted.

### 3. DELAY IN BRINGING DEFENDANT TO TRIAL

Approximately four months and eleven days elapsed from the filing of the information to the date of trial. A portion of this time defendant was confined in jail serving a 60-day term. During all the time up to the day before the case went to trial, defendant was represented by an attorney who also represented the codefendant. The record shows that while on one or two occasions the attorney complained of the delay in setting the case, he either asked for the continuances, acquiesced in, or consented to them. The information was filed on October 14. Defendants were arraigned October 17. At defendant's request the matter was continued to October 20, to plead. October 20 defendants pleaded and at defense attorney's request the case was continued to October 27 to be set. The record fails to show what, if anything, happened between October 20 and November 20. On the latter date, when the case was called, the defense attorney stated that he had consulted with the district attorney and offered to plead both defendants guilty provided Brower was sentenced to the county jail for six months instead of being given a prison sentence. Some discussion ensued between counsel on this subject, the district attorney refusing to recommend the jail sentence. The district attorney stated that Gross was charged with one Brick on another charge and he desired to try that case, to be followed by the case against Gross and

Brower. The district attorney asked that this case be continued to December 4. Defense counsel then stated: "December the 4th is rather a long time—all right." The case was continued to that date. On December 4, defense counsel stated that the district attorney had elected to try the Gross and Brick case that day, to be followed by this case. The proceedings before mentioned concerning the amended information then took place. After it was set aside by the court, the district attorney stated that he would file an amended information and asked that the matter be continued to December 9. After some discussion concerning bail the court continued the matter to December 9. Defendant made no objection. On that date, the court stated that the district attorney was asking that the matter be continued to December 12 and then asked defense counsel if that was agreeable. The latter then said: "Better continue it until the 15th." This the court did. On the 15th when the case was called, defense counsel was not present. After waiting some time for him to appear, the court continued the matter until the next morning. On December 16, defense counsel announced that defendants were ready for trial. The district attorney announced that he was not. A discussion then followed as to whether the district attorney had ever filed the amended information which on December 4 he stated he would file. The district attorney then asked that the trial be set for December 29. Defense counsel said he was "not trying any cases on the 29th." The court then asked what date he would suggest. Counsel then said: "What about the 22nd?" and further stated: "I was relying on the understanding that we were going to dispose of this matter," to which the district attorney replied: "You were relying upon something upon which you had no basis to rely." Defense counsel then asked what day the probation officer's report would be received. (This referred to the conviction of Gross in the Gross and Brick case.) On being told that the date was January 9 he said: "Put this on for the 12th of January. That's the following Monday." The case was continued to January 12. On that date the court transferred the case to another department. Defense counsel called attention to the fact that it was understood the case would be tried that day and that Brower had been in jail for a long time. The court stated that it was engaged in impaneling a jury in a murder case started the week before. Again there was a discussion concerning bail and the case was transferred to department 20, without

any objection being made by defendants. On January 14, the case was called in that department to be set. Discussion of the condition of the court's calendar ensued and the length of time it would take to try this case. Defense counsel suggested that the case be put over to the next day to be set. At this point, the district attorney who was to try the case came in and stated that defense counsel had told him that "he had in mind to plead and . . . would let me know"—evidently referring to a suggestion of defense counsel that the defendants would plead guilty. Defense counsel did not reply to this statement. The case was then continued to the next morning, January 15, without any objection being made. On that morning the case was called to be set. A discussion ensued concerning Gross's offer to plead guilty. It then developed that Brower had been serving time in the county jail on another charge for 60 days prior to November 28. The court asked the district attorney what the earliest date he could try the case was. The latter stated, February 16. The court then asked defense counsel, "How about that?" Counsel said, "That is a month." There then ensued considerable discussion concerning defense counsel's offer to plead Brower guilty provided he would get a one-year county jail sentence. The court suggested the case be set for trial for February 2. Defense counsel then suggested that he and the district attorney confer and then tell the situation to the court; the court could then determine whether it would be willing to impose the county jail sentence. The court suggested that counsel and the police inspectors come in together and talk the matter over with the court. Defense counsel agreed to make the appointment for this meeting, and the case was then continued to February 2. On that date defense counsel announced that he had been unable to arrange the proposed meeting. The court suggested that counsel meet that day with the police inspectors and report later to the court. Further discussion ensued concerning defense counsel's offer to plead the men guilty if Brower were to receive a county jail sentence. It was then agreed that an informal meeting would be had with the court and the police inspectors that afternoon at 4 o'clock. The case was continued to February 11 for trial. On that date defense counsel related the failure of the proposed meeting to take place. Thereupon the court suggested that it contact one of the police inspectors and counsel agreed that that should be done. Defense counsel stated that he could not go to trial until February 24 and

then suggested that as Judge Shoemaker had received a probation report on Gross's conviction in the other case if Gross pleaded guilty his sentence should be given by that judge. The court then agreed to talk to the inspector concerning Brower, and asked defense counsel what date the case should be given for trial. The district attorney suggested February 16. Defense counsel stated that he would be there on the 16th but not for trial, but merely for the judge's determination as to whether he would be willing to consider a county jail sentence for Brower. With that understanding the matter was continued to the 16th. On the 16th, the judge stated that he had seen the inspector. Apparently the judge was unwilling to impose a jail sentence. Defense counsel asked that the case be set for trial. The 24th was suggested by the district attorney. Defense counsel asked that the case be set for the 25th, and it was set for trial for that day. On the 24th, defense counsel stated that Brower wished to discharge him and that Gross desired to plead guilty. On the objection of the district attorney theretofore made, the court declined to accept Gross's plea. Brower stated he wished to defend himself, but the court appointed the public defender to represent him in any capacity he might like. Brower insisted that he act merely in an advisory capacity. The case was continued to the next morning, and then tried. It is clear from this brief statement of the record that the delay was at least consented to, if not actually caused, by the defendant. (See *People* v. *George,* 91 Cal.App.2d 537 [205 P.2d 464], and cases therein discussed.) Defendant was in no hurry to go to trial, for he was trying to persuade the court to agree to give him a county jail sentence if he should plead guilty.

FACTS

■ Before discussing the next two points, it is advisable to set forth the facts established at the trial. The charges against Gross and Brower were the aftermath of a burglary at Longview, Washington. The facts concerning that crime were not contradicted. Brower admittedly had no part in the commission of that crime, as .he was actually in the San Francisco County Jail at the time. On a night in June, 1947, the safe was removed from the Longview Western Union office. It was later found at the city dump with a hole burned in it. The inventory the night before had included unused American Express money orders AQ-8188400 to AQ-8188499 inclusive. (Hereafter these money orders will be referred to

by their last three respective numbers only.) To be valid, these money orders must be signed by an authorized subagent of Western Union on a place left on each order for that purpose. Money orders 487, 486 and 483 were definitely identified as having been in the safe the night it was removed. In addition to the numbers they were identified by the Longview, Washington, address stamped on them. When the safe was found, the money orders were gone. Some time after the burglary, the above three orders were cashed in San Francisco. The name ''William Cole'' was filled in as subagent. The company had no such subagent. Each money order of this type has a remitter's receipt and subagent's stub. When issued in the regular manner, the subagent retains the stub and the buyer of the order receives the receipt. On August 13th, defendant was taken by two police inspectors to his room in San Francisco. Defendant admitted them to the room. In his presence, they seized certain torn pieces of paper which they found in a wastebasket. Piecing them together they were found to be the remitter's receipts and subagent's stubs of orders 487, 486 and 483.

Order 483 was cashed at the Zanzibar Tavern. The owner identified Brower as the person who presented and cashed it, saying that he was cashing it for a friend. Order 486 was cashed at a liquor store by Gross. The clerk who cashed it testified Gross came in alone and that he had never seen Brower before the trial. Order 487 (the one set forth in the information) was cashed at a night club by Gross but Brower was not present. The money orders were signed either ''Ida Stearns'' or ''Davis Stearns'' as payee. These money orders were of the type made payable to a named payee and which the payee does not sign on purchase, but must sign when they are cashed. The handwriting expert of the San Francisco Police Department testified that after comparing certain exemplars written and signed by Brower with the handwriting and signatures on the orders, he was convinced that the filled in matter and the signatures were in Brower's handwriting and had been written by him. A police inspector testified that when he asked Brower ·to compare his own exemplars with the signatures on the money orders, Brower said, ''That finishes me. . . . I will cop a plea to petty theft if you will give me a county jail sentence''; also, that when confronted with a statement given by Gross incriminating Brower, the latter stated to Gross, ''You put the noose on my neck, Joe. Why did you give that statement?''

Defendant did not deny the admissions claimed to have been made to the police inspector, did not take the stand, nor did he offer any evidence even purporting to contradict the fact that the money orders were stolen, the circumstances of their fraudulent cashing, the discovery of the torn stubs in Brower's room, nor the testimony of the handwriting expert that the date and the "Stearns" signatures were written by Brower. The latter, in cross-examining the expert, tried to suggest that someone else, in filling out the money orders, was imitating Brower's handwriting. Thus, it appears from the record, without considering, and entirely disregarding, the Gross confession, that a conclusive case of guilt was made out against Brower.

### 4. NO ERROR IN ADMISSION OF EVIDENCE

■ Defendant contends that the court erred in admitting testimony that Brower cashed order 483, inasmuch as the order he was charged with forging was 487, cashed by Gross. Defendant contends that this was evidence of an independent and unrelated crime. The evidence was admitted prior to proof that Brower had any connection with order 487. The evidence was admissible, as it, together with the other evidence concerning the other two orders which were cashed the same day, shows a general pattern, scheme or plan to forge orders stolen in blank from the Western Union office. Admissibility of such evidence is well established. (*People* v. *Selk,* 46 Cal. App.2d 140 [115 P.2d 607] ; *People* v. *Cassandras,* 83 Cal. App.2d 272 [188 P.2d 546]. See, also, discussion in 8 Cal. Jur. 69.)

■ In *People* v. *Albertson,* 23 Cal.2d 550 [145 P.2d 7], in discussing the admissibility of evidence of other crimes, the court says (p. 578) : "Hence: (a) Ground must first be laid implicating the accused in the charge under trial, and unless sufficient evidence of this has been, in the opinion of the trial judge, first adduced, all evidence of other offenses must be excluded; (b) the collateral offense cannot be put in evidence without proof that the accused was concerned in its commission . . ." Although in the order of proof in our case, the court admitted this character of evidence before it had received evidence complying with this rule, such evidence was later received. Where sufficient evidence to meet the requirements above set forth actually appears in the case, the fact that it came later is not important.

## 5. Corpus Delicti

Defendant contends that the corpus delicti was not established against him. ■ The rule is that the prosecution must establish that a crime has been committed, but the identity of the person who committed it is not a part of the corpus delicti. (*People* v. *Garcia,* 101 Cal.App. 213 [281 P. 508].) ■ Defendant maintains that the order (487) described in the information was not admitted in evidence, basing his contention on some confusion in the use of the terms ''checks'' and ''money orders.'' Both the district attorney and the witnesses used these terms interchangeably. In addition to the money order blanks stolen at Longview, there were also some blank traveler's checks taken at the same time. The difference between a ''check'' and a ''money order'' is that on the latter the payee's name is not signed until the time of the cashing, while on the ''check'' the purchaser signs at the time of purchase and then when cashing, signs again as a means of identification. While the orders 487, 486 and 483 were frequently referred to as ''checks,'' the record clearly indicates that the witnesses and counsel were not referring to the stolen ''checks'' but to these particular orders. When these three were marked for identification, they were referred to as ''checks,'' but when they were actually introduced into evidence they were properly called. Defendant is in error in contending that they were not admitted in evidence. The record clearly shows that all three of them were.

The judgment is affirmed.

Ward, J., concurred.

PETERS, P. J.—I dissent.

The majority opinion fully and fairly sets forth the facts. That opinion concedes that the only purpose in forcing Gross to stand trial and in refusing to accept his plea of guilty ''was to get before the jury evidence inadmissible against Brower.'' The majority concede that this was error and that ''This practice is highly reprehensible.'' Nevertheless, the majority state that they are ''forced'' to hold that the error was not prejudicial under article VI, section 4½ of the Constitution, because the other evidence in the record shows guilt. The inadmissible evidence, being a confession of a supposed coactor, was highly persuasive and could not help but be convincing to a jury. I concede that the other evidence in the record is sufficient to sustain a finding of guilt, but that

evidence is by no means conclusive on the issue. I cannot say, with certainty, that, had the inflammatory confession not been admitted and not been read to the jury and emphasized during the argument, the jury would have convicted. That conviction, aside from the confession, rests primarily on the testimony of a handwriting expert, and such experts have frequently been disbelieved by juries.

Article VI, section 4½, serves a most important purpose, and that is to prevent all errors resulting in a reversal. But that section does not require that all errors, no matter how great, must be held to be nonprejudicial simply because, independently of error, guilt may be spelt out of the record. The fundamental requirement in every case, guaranteed under the state and federal Constitutions, is that the defendant must be accorded a fair trial. The Constitution guarantees that a defendant is entitled to have his guilt or innocence determined according to law, and is entitled to the protection of his substantial rights. Here the defendant was not accorded that protection. How can this court say, as a matter of law, from the cold record that, had defendant been separately tried, as the majority admit he should have been, and had the confession of Gross implicating defendant not been admitted into evidence and read and emphasized to the jury, this jury nevertheless would have convicted him on the testimony of the expert? It is not necessary, in order to require a reversal, that the appellate court be convinced that the defendant was prejudiced by the error. Whenever it appears that such error could have prejudiced him, it is the duty of an appellate court to reverse. Otherwise, the rule that a defendant is entitled to a fair trial will have completely disappeared from our law.

These principles are not new. They are the principles that have frequently been stated by the appellate court, by the Supreme Court of California and by the Supreme Court of the United States. One quotation from each of these courts demonstrates that this is so.

In *People* v. *Adams,* 76 Cal.App. 178, 186 [244 P. 106], a frequently cited case, the District Court of Appeal declared : ''The evidence is sufficient to support the judgment. It is perfectly clear, however, that section 4½ of article VI of the constitution was not intended to mean that the mere fact that the evidence may support the judgment is a sufficient reason in all cases for refusing to set it aside. To give the section that meaning would often lead to gross miscarriages of jus-

tice, as where evidence vital to the case of a party is rejected *or evidence vitally damaging to his case is erroneously admitted,* or where the court erroneously instructs or refuses to instruct the jury as to the law applicable to an essential issue. The courts have not attempted to frame a definition of 'miscarriage of justice' which can be applied to the varying circumstances of the many cases where the constitutional provision is invoked, and obviously it would be impossible to do so. [Citing case.] The quotations which follow, however, taken from cases in which the question has arisen, are elucidating. 'The central or all-important purpose of said constitutional provision is, obviously, to legally justify the courts in refusing to interfere with or disturb verdicts of guilty in criminal cases in the trial of which error has been committed and in which the evidence amply supports such verdicts, when such interference may justly be withheld consistently with a just and proper regard for the substantial rights of persons tried for public offenses.' (*People* v. *Tomsky,* 20 Cal.App. 672, 683 [130 P. 184].) 'We do not understand that the amendment in question was designed to repeal or abrogate the guaranties accorded persons accused of crime by other parts of the same constitution or to overthrow all statutory rules of procedure and evidence in criminal cases. When we speak of administering ''justice'' in criminal cases, . . . we mean something more than merely ascertaining whether an accused is or is not guilty. It is an essential part of justice that the question of guilt or innocence shall be determined by an orderly legal procedure, in which the substantial rights belonging to defendants shall be respected.' (*People* v. *O'Bryan,* 165 Cal. 55, 65 [130 P. 1042].) 'The phrase ''miscarriage of justice'' does not simply mean that a guilty man has escaped, or that an innocent man has been convicted. *It is equally applicable to cases where the acquittal or the conviction has resulted from some form of trial in which the essential rights of the people or of the defendant were disregarded or denied.'* (*People* v. *Wilson,* 23 Cal.App. 513, 524 [138 P. 971].) 'We are unable to determine whether the defendant would or would not have been convicted by the jury had this erroneously admitted testimony been withdrawn from their consideration. This being so, we do not feel that section 4½ of article VI of the Constitution can be given application to uphold the judgment.' (*People* v. *MacPhee,* 26 Cal.App. 218, 226 [146 P. 522].) . . . 'Nor is it a matter for consideration . . . that another jury upon a new trial

might upon such conflicting evidence and proper instructions render a verdict of guilty.' (*People* v. *Roe*, 189 Cal. 548, 561 [209 P. 560].)   [See, also, seven other cases cited.]''   (Italics added.)

The Supreme Court of California, in *People* v. *Sarazzawski*, 27 Cal.2d 7, 10 [161 P.2d 934], stated the proper rule as follows: ''There is no question that the evidence amply supports the verdict and judgment but, regrettably, we find in the record several incidents which should not have occurred in a fair and orderly trial. At least two of such incidents are matters of such grave moment as to amount to substantial departures from the established elements of a fair trial, to which every person charged with crime, no matter how rich or poor, virtuous or debased, is entitled. *When a defendant has been denied any essential element of a fair trial or due process, even the broad saving provisions of section 4½ of article VI of our state Constitution cannot remedy the vice and the judgment cannot stand.*   [Citing cases.]''   (Italics added.)

The federal statute on the subject is substantially similar to article VI, section 4½. The leading case interpreting the federal statute is *Bollenbach* v. *United States*, 326 U.S. 607 [66 S.Ct. 402, 90 L.Ed. 350].   At page 614 appears the following:

''In view of the Government's insistence that there is abundant evidence to indicate that Bollenbach was implicated in the criminal enterprise from the beginning, *it may not be amiss to remind that the question is not whether guilt may be spelt out of a record, but whether guilt has been found by a jury according to the procedures and standards appropriate for criminal trials in the federal courts.*

''. . . The 'technical errors' against which Congress protected jury verdicts are of the kind which led some judges to trivialize law by giving all legal prescriptions equal potency. . . . From presuming too often all errors to be 'prejudicial,' the judicial pendulum need not swing to presuming all errors to be 'harmless' if only the appellate court is left without doubt that one who claims its corrective process is, after all, guilty. In view of the place of importance that trial by jury has in our Bill of Rights, it is not to be supposed that Congress intended to substitute the belief of appellate judges in the guilt of an accused, however justifiably engendered by the dead record, for ascertainment of guilt by a jury under appropriate judicial guidance, however cumber-

some that process may be.'' (Italics added.) (See, also, *Bihn* v. *United States,* 328 U.S. 633 [66 S.Ct. 1172, 90 L.Ed. 1485] ; *Kotteakos* v. *United States,* 328 U.S. 750 [66 S.Ct. 1239, 90 L.Ed. 1557].)

The rules announced in these cases have been violated by the majority opinion. Such a violation of defendant's constitutional rights cannot be justified on the ground that a majority of this court honestly believe that defendant is guilty. The point is that defendant has not been found guilty in the manner required by law. This defendant, under our law, is presumed innocent until found guilty by a jury after a fair trial. The right to a fair trial is as important as the right to a jury trial. It is not sufficient to substitute for the constitutionally protected right to a fair trial the honest belief of a majority of an appellate court that the jury could, and probably would, have convicted without the inadmissible evidence. We cannot and should not substitute trial by appellate court for trial by jury.

The judgment, in my opinion, should be reversed.

A petition for a rehearing was denied July 9, 1949. Peters, P. J., voted for a rehearing. Appellant's petition for a hearing by the Supreme Court was denied July 21, 1949. Carter, J., and Schauer, J., voted for a hearing.