Filed 7/18/14  Certified for Publication 7/29/14 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>LOUIS VAN LEONARD et al.,<br><br>    Defendants and Appellants. | D062660<br><br><br><br>(Super. Ct. No. SCD239290) |


APPEALS from judgments of the Superior Court of San Diego County, Peter C. Deddeh, Judge.  Judgment against Louis Van Leonard affirmed as modified.  Judgment against Charles Dwayne Walser affirmed.


Carl Fabian, under appointment by the Court of Appeal, for Defendant and Appellant Louis Van Leonard.

Jill M. Klein, under appointment by the Court of Appeal, for Defendant and Appellant Charles Dwayne Walser.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, Kristine A. Gutierrez and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Louis Van Leonard and Charles Dwayne Walser of two counts each of pimping (Pen. Code § 266h, subd. (a)),[1] two counts each of pandering (§ 266i, subd. (a)(2)), and one count each of assault by means of force likely to produce great bodily injury (former § 245, subd. (a)(1)).[2] The jury also convicted Leonard of one count of making a criminal threat. (§ 422.) Following a bench trial, the court found true that Leonard had a prior prison term under section 667.5, subdivision (b); a prior serious felony conviction under section 667, subdivision (a)(1); and a "[s]trike prior" conviction for purposes of section 667, subdivisions (b) through (i). The court ordered that Leonard's prison prior under section 667, subdivision (a)(1), be stricken for purposes of sentencing. The court further stayed punishment under section 654 on Leonard's and Walser's convictions for pimping. With enhancements, the court sentenced Leonard to a

---

[1]   Further statutory references are to the Penal Code unless otherwise specified.

[2]   Effective January 1, 2012, the relevant portion of section 245, subdivision (a)(1), was recodified as section 245, subdivision (a)(4), without substantive change. (Stats. 2011, ch. 183, § 1.) For clarity, we will continue to refer to former section 245, subdivision (a)(1), in this opinion.

term of 23 years in prison. The court sentenced Walser to a term of eight years four months in prison.[3]

Leonard and Walser appeal, contending (1) the operative amended information at trial was not properly filed; (2) the evidence was insufficient to support the defendants' convictions on certain counts; (3) the court erred in not giving a unanimity instruction on pandering; (4) the court erred in admitting expert testimony regarding the culture of pimping and pandering; (5) the court erred in limiting cross-examination of the victims regarding their bias and credibility; (6) the defendants' sentences on their assault convictions and on Leonard's criminal threat conviction should have been stayed under section 654; (7) the court abused its discretion by declining to dismiss Leonard's "strike prior" under *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497; and (8) the judgment against Leonard erroneously states that his prison prior under section 667.5, subdivision (b), was stayed by the court. We modify the judgment against Leonard to provide that his prison prior was stricken by the court, rather than stayed, and affirm it as modified. We affirm the judgment against Walser in full.

FACTS

In 2011, Leonard approached Cynthia Jordan along El Cajon Boulevard in San Diego.[4] Jordan was working as a prostitute at the time, and she thought Leonard might

---

[3] The court additionally sentenced Walser to a term of eight months, to be served consecutively, for a 2010 conviction for drug possession. (Health & Saf. Code, § 11377, subd. (a).)

[4] In their briefing, Walser and the Attorney General refer to the victims by their first names and last initials. Leonard uses their full names. The trial court prohibited any

be a potential client. After speaking with him, however, Jordan understood that Leonard was interested in becoming her pimp. Jordan told Leonard her life had been difficult lately, and Leonard offered her protection. Leonard said he could provide Jordan with a place to live and food to eat if Jordan continued to work as a prostitute and gave her earnings to Leonard. Jordan soon gave Leonard a $100 "choosing fee," symbolizing her choice of Leonard as her pimp, and moved into Leonard's apartment the next day.

Walser and his girlfriend also lived in Leonard's apartment. Because Leonard has muscular dystrophy and uses a wheelchair, Walser assisted Leonard with certain daily activities. Walser's duties included bathing and dressing Leonard, lifting Leonard into and out of his wheelchair, and placing Leonard in his car. Walser received payments from the government as Leonard's caregiver. Walser, known by his nickname "Charlie Mack," also assisted in Leonard's pimping operation. He was Leonard's "enforcer" and the "strong arm" Leonard needed because he was in a wheelchair.

Leonard controlled Jordan's activities. Leonard told Jordan how to speak to potential clients, how much to charge, when to demand payment, and how to avoid contact with other pimps. Leonard and Walser supplied Jordan with methamphetamines to feed her severe drug addiction. Jordan worked out of the apartment and in hotel rooms. Leonard eventually rented the apartment next door to use for prostitution. Leonard often drove Jordan to out calls, and he waited nearby to make sure Jordan turned

reference to the victim's last names in open court, though this prohibition was unevenly applied. The victims here do not fall within the class of persons whose identities must be kept confidential upon request. (See §§ 293 & 293.5.) We therefore use their full names.

4

the payments over to him immediately afterwards. Walser, and sometimes other men, rode along with Leonard for protection.

Leonard posted advertisements for Jordan on adult-oriented Web sites, which resulted in more lucrative prostitution work than the street. Walser assisted by taking sexually-suggestive photographs for these advertisements. Jordan earned up to $1,000 per night, from multiple encounters. The money went towards Leonard's rent, car payments and upgrades for his two Cadillacs, and other expenses.

Leonard required Jordan to have sex with him as well. Eventually, Jordan developed romantic feelings for Leonard, which he encouraged. Leonard told Jordan she was beautiful and he wanted to marry her. Leonard promised Jordan her own apartment and a better life. Jordan believed Leonard, although she was aware he was pimping several other women at the same time.

One other woman was Amber Hanson. Hanson met Leonard through Walser's brother, Ivan Mosley (also known as "J. Mack"). Mosley approached Hanson one night while she was working as a prostitute on El Cajon Boulevard. He brought Hanson to Leonard's apartment, where Walser sold Hanson some methamphetamine and Hanson and Mosley had oral sex. Hanson, Mosley, and Walser discussed Hanson's work as a prostitute. Mosley gave Hanson his number to call if she wanted to buy drugs in the future. Later, Hanson contacted Mosley, and they met at Leonard's apartment a second time. This time, Hanson met Leonard, who offered to be Hanson's pimp. Leonard said he would provide her with a place to stay and food to eat, if she turned over all of her earnings to him. Hanson agreed and moved into Leonard's apartment.

5

Hanson continued to work the streets, although Leonard began to post advertisements for her services on adult-oriented Web sites as well. Hanson sometimes traveled with Leonard, and she continued to work as a prostitute on these trips. In general, Hanson made between $500 and $1,000 per night. Like Jordan, she gave all of her earnings to Leonard. He used the money for rent, car repairs, and drugs. Also like Jordan, Hanson developed romantic feelings for Leonard. Leonard told Hanson he wanted to marry her. Hanson had Leonard's nickname, "Mr. X.," tattooed on her chest. She became pregnant with twins and believed Leonard to be the father.

If Hanson did not have a client's payment for Leonard, or if Hanson spoke in a way that upset Leonard, he would order Walser to beat her. Leonard would say, "beat that bitch," and Walser would do so. After Hanson became pregnant, she stood up to Leonard more often. She did not want to continue working so many hours as a prostitute. Leonard responded that "his other baby's mother . . . was out there working the blade until she was ready to pop," and the beatings increased in severity. In one instance, Hanson and Jordan got into an argument. To punish Hanson, Walser punched her. Hanson suffered a cracked tooth, a dislocated jaw, and a broken lip from Walser's beating. Hanson also beat and cut herself.

Eventually, Hanson left Leonard. She returned to El Cajon Boulevard to work the streets. One night, Leonard pulled up beside her in his Cadillac. Walser was in the car as well. Walser grabbed Hanson and threw her into Leonard's Cadillac. They drove to Leonard's apartment, where Walser led Hanson to Leonard's bedroom. Leonard told Hanson she should not have left and she needed to return to Leonard. Leonard instructed

Walser to beat Hanson, and he complied. Walser kicked Hanson in the stomach, back, legs, and face. Leonard kicked Hanson in the face as well. Leonard confined Hanson to the bedroom until Hanson agreed to work for him again. When Leonard released her, she returned to the streets and sought out her new pimp, Kevin Smith.[5] Hanson soon started bleeding profusely as a result of the beating. Smith drove her to a hospital emergency room, where she suffered a miscarriage.

Meanwhile, Jordan had become fearful of Leonard and his aggressive nature. When Jordan did not want to work, Leonard used threats and psychological manipulation to keep her in line. Jordan witnessed Walser beating Hanson. Jordan sometimes left the apartment for days or a week at a time, and she moved down the street for a time. However, Jordan continued to work for Leonard out of fear.

After almost a year working for Leonard, Jordan entered treatment for drug addiction. She was in treatment for a little over a month. She did not see Leonard for a while, but they spoke on the phone. When Jordan returned to the apartment to check on Leonard, he pressured her to work for him again. They began to argue, and Jordan attempted to drive away. She was unable to do so, however, because Leonard had parked behind her car in his wheelchair, blocking her way out. A number of men approached Jordan's car and began beating on her windows. At least one window was smashed, and the men dragged Jordan out of her car and slammed her to the ground. Jordan thought

---

[5]    Smith was later charged with pimping and pandering as Leonard and Walser's codefendant. His case was severed for trial, and this court affirmed his conviction on appeal. (*People v. Smith* (Jan. 23, 2014, D063100) [nonpub. opn.].)

7

her life was in danger. They brought her into Leonard's apartment, where Leonard took Jordan's phone and told her not to leave.

Jordan eventually escaped and drove her car, which also had its tires slashed, down El Cajon Boulevard. Leonard caught up to her and convinced her to get into his car to talk. Leonard then told Jordan if she ever left him again he would kill her. Frightened anew, Jordan jumped out of Leonard's car at a stoplight, went back to her car, and drove to find help. When she stopped at an auto parts store, an unknown person called police.

Jordan told police about the events of that day and her history working for Leonard. The police began an investigation. Jordan agreed to make a number of recorded "pretext" calls to Leonard in an effort to obtain evidence against him. In one call, Jordan and Leonard discussed a potential client. Jordan explained that the client would pay $800, and she asked to keep $200. Leonard responded, "All right[,] I'll give you two out of the eight." In two other calls, Jordan and Leonard discussed how Jordan should "recruit" other women to work for Leonard. Leonard asked Jordan to bring one woman to his apartment and tell her she would be able to "chill" there. Leonard explained, "I'll come back and snatch her up with the quickness. [¶] . . . [¶] But you got to watch her 'cause I don't want nobody else giving her false- false information [¶] . . . [¶] and trying to move her while I'm not there." The police uncovered Internet advertisements for Jordan and Hanson, and at least one account was linked to Walser through his e-mail address.

Police investigators reviewed Leonard's postings on social media and found repeated references to pimping and "P's," which is slang for pimps. For example, one

8

post stated, "June 4, 1967, a pimp was born." That date is Leonard's birth date. Other posts stated, "Just got back from Las Vegas, can you say a pimp named X the Pimp" and "Why is the homies calling my Cadillac, The Super Duper Ho Scooper." A photograph in one post showed Leonard in a red suit holding two "pimp cups" engraved with the name "Mr. X."

At trial, Jordan and Hanson testified for the prosecution pursuant to grants of immunity. James Hunter, a detective with the San Diego Police Department (SDPD), testified regarding the investigation of Leonard and Walser. Detective Hunter also testified as an expert regarding the pimping subculture, as well as the patterns of psychological and physical abuse that pimps use to control women.

Walser testified in his own defense. He denied knowing Leonard was a pimp or that any prostitution was occurring in the apartment. Walser denied being violent toward Hanson or anyone else. Mosley, Walser's brother, testified he knew Jordan and Hanson were prostitutes, but he did not know Leonard or Walser were engaged in pimping or pandering. The building manager for Leonard's apartment, Anthony Clemons, testified that he had no reason to believe that prostitution or other illegal activity was occurring in the apartment.

DISCUSSION

I

A

The prosecution filed a third amended information on June 26, 2012. As relevant to this appeal, the third amended information added two allegations against Leonard: a

9

prior serious felony conviction under section 667, subdivision (a)(1), and a "strike prior" conviction under section 667, subdivisions (b) through (i). The trial court clerk was unable to find any record of proceedings on the date the third amended information was filed.

Approximately one month later, during a hearing on the date set for defendants' jury trial, the court stated, "[M]y clerk tells me that these gentlemen have not been arraigned on the third amended complaint [*sic*]. Is that true?" The prosecutor answered affirmatively, and the court proceeded to arraign Leonard and his codefendants. Leonard's counsel stated he had received a copy of the amended information. Leonard waived reading of the amended information, pleaded not guilty, and denied the allegations.

The court minutes from the hearing reflect as follows: "All defendants are advised of their rights and arraigned on the Third Amended Information filed June 26, 2012. The defendants have received a copy of the information and waive reading. The defendants waive their rights and enter a plea of **NOT GUILTY** to all counts and allegations as charged."

B

Leonard contends the court did not have jurisdiction to arraign him or proceed to trial on the additional allegations in the third amended information because the record does not reflect any order granting the prosecution leave to file the amended information. We conclude the court had jurisdiction.

10

Following a defendant's plea, leave of court is normally required before an information may be amended. (§ 1009; *People v. Valladoli* (1996) 13 Cal.4th 590, 606, fn. 3 (*Valladoli*).) As this court recently explained, "the Supreme Court made it clear that a trial court must *approve* the filing of the amended charging document, and that it is within the trial court's discretion to *deny* leave to amend." (*People v. Lettice* (2013) 221 Cal.App.4th 139, 149 (*Lettice*).) The court retains this authority even where, as here, the prosecution seeks to add allegations of a defendant's prior convictions. (*Ibid.*; see also § 969a.) Although the prosecution normally requests leave to amend in writing, the trial court has authority to amend the information on an oral motion (*People v. Sandoval* (2006) 140 Cal.App.4th 111, 133-134) or sua sponte on the court's own motion (*People v. Carrasco* (2006) 137 Cal.App.4th 1050, 1057).

Where, as here, an amended information was filed and no order explicitly approves its filing, we will presume in favor of the judgment that the amended information was filed with leave of court. (See *People v. Loggins* (1955) 132 Cal.App.2d 736, 738 (*Loggins*) ["The amended information here was filed in open court and is presumed to have been filed pursuant to leave of court, although the minutes of the court do not so state."]; see also *People v. Elliott* (1960) 186 Cal.App.2d 178, 184, fn. 2.) In civil appeals, a similar rule applies in the context of amended complaints. (See *Head v. Logan* (1940) 39 Cal.App.2d 243, 247 ["The record is silent as to whether or not

11

permission was given to file the pleading in question. We must therefore presume, in support of the judgment, that such permission was granted."].)[6]

These principles are specific applications of the presumption of correctness that governs all appeals. " 'A judgment or order of the lower court is *presumed correct*. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown. This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error.' " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564; see also *People v. Wiley* (1995) 9 Cal.4th 580, 592, fn. 7.) Moreover, " 'a trial court is presumed to have been aware of and followed the applicable law. [Citations.]' " (*People v. Stowell* (2003) 31 Cal.4th 1107, 1114.)

Relying on *People v. Brower* (1949) 92 Cal.App.2d 562, Leonard argues the absence of a court order in the record makes the third amended information a "nullity." In *Brower*, an amended information was filed without leave of court. (*Id.* at p. 564.) The trial court recognized the error and set aside the improperly-filed amended information.

---

[6]     The Attorney General relies heavily on *People v. Beck* (1945) 71 Cal.App.2d 637, which states a similar principle: "[I]t is presumed in the absence of positive evidence to the contrary that the proceedings at the time of filing the amended information were regular and proper." (*Id.* at p. 641.) Leonard points out the defendants in *Beck* were present in court when the amended information was filed. However, this fact is irrelevant to our conclusion here. It is the absence of information, i.e., a silent record, that compels the application of the presumption of correctness. (See *People v. Thurmond* (1985) 175 Cal.App.3d 865, 874 ["Where the record is silent, the judgment of the lower court is presumed correct."].) The burden is on the party challenging a judgment to affirmatively show error. The absence of an order approving filing, and the absence of any record of proceedings on the date of filing, simply reflect a silent record and are insufficient to establish error. (See *ibid.*)

(*Ibid.*)  On appeal, the defendant contended the filing of the amended information had displaced the original information, such that the defendant could not thereafter be tried on the original information.  (*Ibid.*)  The court rejected defendant's contention:  "The filing of the amended information without leave of court in nowise affected the original information, nor did its setting aside."  (*Ibid.*)  The court further stated, "Until the court had granted permission that it be filed, the amended information had no place in the record and was not legally filed."  (*Ibid.*)

Leonard claims the latter statement applies to the third amended information here. Unlike *Brower,* the record here is silent regarding the court's approval of the amended information.  The trial court in *Brower* specifically stated the amended information had been filed without leave of court.  (*People v. Brower, supra*, 92 Cal.App.2d at p. 564.) The trial court clerk here was unable to find any record of proceedings on the date the third amended information was filed.  During the arraignment of Leonard and Walser on the third amended information, the trial court made no mention of its filing.[7]  Leonard's argument would require an affirmative statement of approval in the record to confirm on appeal that the third amended information was "legally filed."  (See *Brower*, at p. 564.)

---

[7]     Neither the court nor defense counsel expressed any surprise that the third amended information had been filed or that Leonard, Walser, and their codefendant would need to be arraigned on it.  Courts have implied a trial court's approval of an amended criminal complaint on somewhat analogous records.  (See *Muns v. Superior Court In and For Sutter County* (1955) 137 Cal.App.2d 728, 732 [distinguishing *Brower*]; see also *Merz v. Superior Court In and For Sutter County* (1955) 137 Cal.App.2d 840, 841.)  However, we believe the most accurate characterization here is that the record is simply silent on the issue of approval.

13

However, that requirement would be inconsistent with the well-settled presumption of correctness. Nothing in *Brower* shows the court intended that result.

Leonard also relies on *Chambers v. Santa Cruz City School Dist.* (1987) 193 Cal.App.3d 518. In that case, plaintiffs filed a personal injury lawsuit against two defendants. (*Id.* at p. 520.) Plaintiffs did not serve the defendants with their summons and complaint within the statutorily-mandated time period. (*Ibid.*) After the expiration of this period, a third party moved for leave to file a complaint in intervention, which the trial court approved. (*Ibid.*) The complaint in intervention was filed with the court and defendants answered. (*Id.* at pp. 520-521.) The defendants then moved to dismiss the principal complaint on the ground defendants had not been served with that complaint. (*Id.* at p. 521.) The trial court granted the defendants' motion and dismissed both the principal complaint and the complaint in intervention on the ground it had no jurisdiction to hear either. (*Ibid.*) Under the then-prevailing statutory scheme, dismissal of the principal complaint was mandatory (with certain inapplicable exceptions) if the defendants were not served with a summons and complaint within three years of filing. (*Id.* at pp. 522-523.) On appeal, the court affirmed, holding that after the time period for service of the principal complaint had run, the trial court lacked jurisdiction "to do anything but dismiss the action." (*Id.* at p. 524.) The trial court therefore did not have the power to grant the third party leave to file its complaint in intervention, and it was properly dismissed as well. (*Ibid.*)

Leonard contends the following language from *Chambers* supports his position here: " 'Thus, while it is true that had the complaint in intervention been validly filed it

14

would have become an independent action with a life of its own [citation], the court lacking power to order it filed after the expiration of three years, the clerk of the court could not breathe life into it merely by applying a file stamp to it.' " (*Chambers v. Santa Cruz City School Dist., supra*, 193 Cal.App.3d at p. 522, quoting *Floyd Neal & Associates, Inc. v. Superior Court* (1977) 72 Cal.App.3d 734, 739.) But unlike the record here, the record in *Chambers* established the court's lack of jurisdiction over the complaint in intervention. The improper filing—which the trial court in *Chambers* approved—could therefore be challenged. Here, the clerk's file stamp on the third amended information does not by itself compel a conclusion that it was properly filed with leave of court. Rather, in the absence of any indication that leave of court was not granted, we must presume it was properly filed.

The remaining authority on which Leonard relies is similarly inapposite. In *People v. Flowers* (1971) 14 Cal.App.3d 1017, the court confirmed "the discretion of the trial court to disallow" an amended information, but it did not consider whether an amended information could be challenged on appeal where the record as to the trial court's approval was silent. (*Id.* at p. 1021; see also *People v. Superior Court* (*Alvarado*) (1989) 207 Cal.App.3d 464, 472.) In *Foley v. Foley* (1956) 147 Cal.App.2d 76, the court considered whether a filing was ineffective where the clerk did not collect the required filing fee. The court held that "the timely filing of the notice [of motion] by the County Clerk was effective notwithstanding the fact that the filing fee was not paid within the statutory period." (*Id.* at p. 78.) These authorities have no application here.

15

C

Analogizing this case to our recent decision in *Lettice*, Leonard argues in the alternative that the silent record here demonstrates the trial court erred by not exercising its discretion to allow or disallow the amended information. In *Lettice*, the defendant pleaded guilty pursuant to a plea agreement, and the trial court accepted his plea. (*Lettice, supra*, 221 Cal.App.4th at p. 144.) On the date set for sentencing, the trial court stated, " 'Okay. There is an amended information. We've talked about this in chambers. It appears the People believe that the defendant has a strike prior . . . .' " (*Ibid.*) Following a colloquy with the prosecutor about the timing of the discovery of the prior, the court attempted to arraign the defendant on the amended information. (*Ibid.*) Defense counsel objected. (*Ibid.*) The court insisted, however, and the defendant was arraigned on the amended information. (*Id.* at p. 145.) The court and counsel discussed the defendant's prior plea, and the prosecution moved to withdraw from the plea agreement. (*Ibid.*) The court deferred ruling on that motion, noting it raised complicated issues of notice and estoppel. (*Ibid.*) At the end of the hearing, the court stated, " '[T]here's a difference . . . between withdrawing the plea or demanding to withdraw the plea and *a statutory right to add the strike after the plea*.' " (*Id.* at p. 146, italics added.)

On appeal, this court held that the trial court committed reversible error when it allowed the amendment without exercising its discretion to determine whether amendment was proper. (*Lettice, supra*, 221 Cal.App.4th at p. 153; see also *Valladoli, supra*, 13 Cal.4th at p. 606, fn. 3.) This court stated, "The record reflects that the People failed to obtain court approval prior to filing the amended information, and that the court

16

filed the amended information under the misimpression that it was required to do so." (*Lettice,* at p. 152.)

*Lettice* had the benefit of a more complete record surrounding the amended information than we have here. Although the circumstances of the actual filing of the amended information in *Lettice* are unclear, the trial court stated incorrectly the prosecution had a " 'statutory right' " to file the amended information even after defendant's plea. (*Lettice, supra*, 221 Cal.App.4th at p. 146; see also *id.* at p. 152 ["[T]he trial court expressly, and erroneously, stated that the People had a statutory *right* to file the amended information . . . ."].)

*Lettice* distinguished the situation in which a silent record would require affirmance. (*Lettice, supra*, 221 Cal.App.4th at p. 152 ["We cannot presume that the trial court engaged in the required 'prudent exercise of [its] discretion [under section 969a]' . . . [citation], in light of a record that demonstrates that the trial court clearly believed that it had no such discretion."].) Here, the record is silent, and the presumption governs. (See *Loggins, supra*, 132 Cal.App.2d at p. 738; cf. *Lettice,* at p. 152 ["This case is thus distinguishable from the silent record at issue in *People v. Loggins* . . . ."].)

Requiring leave of court before the prosecution may amend an information following a defendant's plea has long been an important safeguard for the rights of the accused. (See *People v. Superior Court* (*Alvarado*)*, supra*, 207 Cal.App.3d at p. 472.) The discretion afforded trial courts to refuse such amendment "ensure[s] the due process rights of criminal defendants are adequately protected." (See *Valladoli, supra*, 13 Cal.4th at p. 607.) Nonetheless, we cannot conclude on the silent record here that the trial court

17

did not exercise its discretion or did not approve the third amended information at issue. (*Loggins*, *supra*, 132 Cal.App.2d at p. 738; see also *People v. Elliott, supra*, 186 Cal.App.2d at p. 184, fn. 2; *Head v. Logan, supra*, 39 Cal.App.2d at p. 247.)

D

Even had he shown that the trial court erred by not exercising its discretion to approve the filing of the third amended information, Leonard has forfeited that argument by not objecting in the trial court. It appears no reported decision has directly addressed the precise issue of forfeiture presented here. In *Lettice*, for example, this court proceeded to the merits of the trial court's order without considering forfeiture. (*Lettice, supra*, 221 Cal.App.4th 139, 147, fn. 8 ["We exercise our discretion to consider Lettice's claim on the merits despite any possible forfeiture for failure to object in the trial court."].)

As a general rule, however, " ' "[a]n appellate court will ordinarily not consider procedural defects or erroneous rulings, in connection with relief sought or defenses asserted, where an objection could have been made, but was not, presented to the lower court . . . ." ' " (*People v. Saunders* (1993) 5 Cal.4th 580, 589-590.) " ' "No procedural principle is more familiar to this Court than that a constitutional right," or a right of any other sort, "may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." [Citation.]' " (*Id.* at p. 590.) A defendant may forfeit a substantive defense through failure to plead it. (See, e.g., *People v. Holloway* (2004) 33 Cal.4th 96, 155, fn. 18 [double jeopardy].) A defendant may also forfeit a claim of error based on the trial

18

court's failure to exercise discretion on a procedural ruling. (See, e.g., *People v. Dykes* (2009) 46 Cal.4th 731, 779 [admission of evidence under Evid. Code, § 352].)

The Supreme Court's opinion in *People v. Tindall* (2000) 24 Cal.4th 767 (*Tindall*) is instructive. *Tindall* considered the interplay between the prosecution's ability to amend an information under section 969a, on one hand, and the requirement that a single jury decide both guilt and the truth of any prior conviction allegations under section 1025, subdivision (b), on the other. (*Tindall,* at pp. 769-770.) The Supreme Court held that a court may not allow such an amendment after the jury deciding a defendant's guilt has rendered a verdict and been discharged because, in that case, the same jury could not decide the truth of the newly-added prior conviction allegations. (*Id.* at p. 782.) As relevant here, the Supreme Court further determined that a claim of error, based on a court's improper approval of such an amendment, was subject to forfeiture for failure to object in the trial court. (*Id.* at p. 776, fn. 6.)

*Tindall* based its conclusion on the fact that the order was "in excess of [the trial court's] jurisdiction," rather than a matter of fundamental subject matter jurisdiction. (*Tindall, supra*, 24 Cal.4th at p. 776, fn. 6.) "A court acts in excess of its jurisdiction when 'it has no "jurisdiction" (or power) to act except in a particular manner, or to give certain kinds of relief, or to act without the occurrence of certain procedural prerequisites.' " (*Id.* at p. 776.) "[A] court's act in excess of its jurisdiction is valid until set aside, and a party may be precluded from setting it aside, due to waiver, estoppel, or the passage of time." (*Id.* at p. 776, fn. 6.)

19

"Timely filing of the valid information gives the superior court jurisdiction to try an accused." (*People v. Smith* (1986) 187 Cal.App.3d 1222, 1224; see also 4 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Pretrial Proceedings, § 200, p. 458.) Here, there is no argument a valid information was not filed at the outset of the case. The trial court thus had fundamental subject matter jurisdiction. (See *People v. Smith, supra,* 187 Cal.App.3d at p. 1224.) The court's decision to allow the third amended information was an act in excess of jurisdiction because (as we here assume) it did not exercise its discretion to determine whether amendment was proper. Thus, like *Tindall*, any claim of error based on that decision was forfeited by Leonard's failure to object in the trial court. (See *Tindall, supra*, 24 Cal.4th at p. 776, fn. 6.)

Leonard argues the situation here is analogous to a statute of limitations defect on the face of a charging document, which may be raised for the first time on appeal. (See *People v. Williams* (1999) 21 Cal.4th 335, 338.) This type of defect, however, has been traditionally seen as affecting the court's fundamental subject matter jurisdiction and power to proceed. (See *Cowen v. Superior Court* (1996) 14 Cal.4th 367, 372.) More recent decisions of the Supreme Court have removed these jurisprudential underpinnings of the statute of limitations rule. (See *id.* at p. 374; *Williams,* at p. 337.) However, the rule survives as a matter of stare decisis in the absence of a "good reason" to change it. (*Williams,* at p. 341.)

The alleged error at issue here does not give rise to the same concerns as a facially invalid charging document. The historic concern over a court's power to proceed is not implicated where, as here, a court acts in excess of jurisdiction rather than without

20

jurisdiction. (See *Tindall, supra*, 24 Cal.4th at p. 776, fn. 6.) Moreover, we have found no similar historic rule against forfeiture that would give rise to stare decisis concerns. To the extent similar issues have been considered before, the available authority indicates that applying the rule of forfeiture is proper. (See *People v. Beck, supra*, 71 Cal.App.2d at p. 641 ["Where an amended pleading is filed in open court pursuant to section 1008 . . . by the district attorney and the accused being present offers no objection thereto, he may not for the first time raise the point on appeal."]; see also *People v. Collins* (1963) 217 Cal.App.2d 310, 313 ["Defendant did not object to the amendment of the information or ask for a continuance and thereby waived the right to assert error."]; *People v. Vance* (1956) 138 Cal.App.2d 871, 874.)

This court has discretion to address a claim of error raised for the first time on appeal. (*People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6 (*Williams*).) We decline to do so here. The decision whether to allow an amended information is inherently fact-bound. (See *Valladoli, supra*, 13 Cal.4th at p. 607 [citing factors such as "the reason for the late amendment," "whether the defendant is surprised," and "whether the prosecution's initial failure to allege the prior convictions affected the defendant's decisions during plea bargaining, if any"].) We are unable to fully weigh these facts on the current record, in large part because of Leonard's failure to object in the trial court. Consideration of the merits would therefore be unwarranted. (See *People v. Smith* (2001) 24 Cal.4th 849, 855 (conc. opn. of Mosk, J.) ["[F]orfeiture nevertheless counsels an appellate court not to reach a nonpreserved claim when it has resulted in a void in the record that the court itself cannot or should not fill."].)

21

E

Leonard further claims his counsel was ineffective by not objecting to the third amended information. "To prevail on a claim of ineffective assistance of counsel, defendant 'must establish not only deficient performance, i.e., representation below an objective standard of reasonableness, but also resultant prejudice.' [Citation.] Tactical errors are generally not deemed reversible; and counsel's decisionmaking must be evaluated in the context of available facts. [Citation.] To the extent the record on appeal fails to disclose why counsel acted or failed to act in the manner challenged, we will affirm the judgment "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation . . . ." [Citation.]' " (*People v. Hart* (1999) 20 Cal.4th 546, 623-624 (*Hart*).) "A claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding." (See *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)

Here, Leonard asserts there could be no tactical reason for his counsel's failure to object to the third amended information. Leonard does not persuasively explain his assertion. As we have explained, the record here is exceedingly thin. The third amended information was filed and, approximately a month later, the defendants were arraigned on it without objection. The gap in time and the absence of discussion regarding filing at the hearing strongly suggest considerations not reflected in the record were potentially at play. Moreover, consideration of the *Valladoli* factors makes relevant numerous aspects of the defendant's litigation strategy, which Leonard's counsel may have felt would be harmful to explore in front of the trial court. We note the record reflects little of

22

relevance regarding those factors and how they would have affected other trial issues. Given the record, we are cognizant of the principle that "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ." (*Strickland v. Washington* (1984) 466 U.S. 668, 689.) Under these circumstances, we cannot say that " ' "there simply could be no satisfactory explanation" ' " for counsel's failure to object. (*Hart, supra*, 20 Cal.4th at pp. 623-624.)

Moreover, if we were to consider the question of prejudice, we would conclude that Leonard's claim must fail on this ground as well. " '[P]rejudice must be affirmatively proved; the record must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." ' " (*Hart, supra*, 20 Cal.4th at p. 624.) The record is devoid of any facts that would demonstrate a basis for the court to deny leave to amend the information. (See *Valladoli, supra*, 13 Cal.4th at p. 607.) Leonard argues the prosecution did not offer any explanation for the late filing. But the question was never asked, and we cannot draw any inferences from any alleged lack of explanation. Leonard further argues he would have reconsidered his plea bargaining strategy had he known of the additional allegations earlier. Any inference regarding plea bargaining, however, would be speculation. The record does not reflect any plea bargaining occurred, at what time, or when Leonard knew the prosecution would be adding additional allegations. (The third amended information was filed approximately one month before trial.) On this record, Leonard

has not established a " ' "reasonable probability that . . . the result of the proceeding would have been different" ' " had his counsel objected.  (See *Hart,* at p. 624.)

## II

## A

Leonard and Walser each contend the evidence was insufficient to convict them of certain charges.  "The applicable standard of review is well settled:  ' "To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." '  [Citations.]  ' " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.' " '  [Citations.]  The standard of review is the same when the prosecution relies mainly on circumstantial evidence."  (*People v. Valdez* (2004) 32 Cal.4th 73, 104.)

"In resolving claims involving the sufficiency of evidence, a reviewing court must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' "  (*People v. Marshall* (1997) 15 Cal.4th 1, 34.)  "In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts.  [Citation.]  Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact.  [Citation.]  Moreover, unless the

24

testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction. " (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

B

Leonard contends the evidence was insufficient to convict him of an assault on Jordan by means of force likely to produce great bodily injury. (See § 245, subd. (a)(1).) He was prosecuted on a theory of aiding and abetting the assault on Jordan in her car following her visit to his apartment after her time away in drug rehabilitation.

"An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.) "[I]t is a defendant's action enabling him to inflict a present injury that constitutes the actus reus of assault. There is no requirement that the injury would necessarily occur as the very next step in the sequence of events, or without any delay." (*People v. Chance* (2008) 44 Cal.4th 1164, 1172.) Assault is a general intent crime; it "does not require a specific intent to injure the victim." (*People v. Williams* (2001) 26 Cal.4th 779, 788.) "[A] defendant guilty of assault must be aware of the facts that would lead a reasonable person to realize that a battery would directly, naturally and probably result from his conduct. . . . He, however, need not be subjectively aware of the risk that a battery might occur." (*Ibid.*)

"One may commit an assault without making actual physical contact with the person of the victim; because the statute focuses on *use* of a deadly weapon or instrument or, alternatively, on force *likely* to produce great bodily injury, whether the victim in fact suffers any harm is immaterial. [Citation.] That the use of hands or fists alone may

25

support a conviction of assault 'by means of force likely to produce great bodily injury' is well established." (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028.)

"[A]n aider and abettor is a person who, 'acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime.' " (*People v. Prettyman* (1996) 14 Cal.4th 248, 259.)

Leonard argues the incident in question consisted of two discrete events: first, an act of "vandalism" in which Jordan's car window was smashed and her tires were slashed; and second, an act of violence toward Jordan when she was pulled from the car, slammed to the ground, and dragged back into Leonard's apartment. Leonard claims the prosecution elected to proceed on the basis of only the first event and, if they did not, a unanimity instruction was required. He argues the evidence surrounding the first event does not constitute sufficient evidence of an assault by means of force likely to produce great bodily injury. Leonard also claims that two events combined still would not constitute sufficient evidence.

We do not agree the evidence established two discrete events that required an election by the prosecution. Where, as here, " 'the acts are so closely connected in time as to form part of one transaction' [citation]," they are properly considered part of the same offense. (See *People v. Jennings* (2010) 50 Cal.4th 616, 679.) For the same reason, a unanimity instruction was not required. (*Ibid.*) Moreover, the prosecution did not make the election alleged by Leonard. At the outset of his closing argument, the

26

prosecutor identified the entire incident as support for the assault charge against

Leonard.[8] Even had the prosecutor limited his argument to the first part of the incident,

our analysis would remain unchanged because the jury was not limited to the

prosecution's stated theory. (See *People v. Perez* (1992) 2 Cal.4th 1117, 1126 ["It is

elementary, however, that the prosecutor's argument is not evidence and the theories

suggested are not the exclusive theories that may be considered by the jury."].)

Here, the evidence showed that a group of men attacked Jordan while she was in

the car, smashed her car window, dragged her out of the car, slammed her to the ground,

and forced her into Leonard's apartment. By positioning his wheelchair behind Jordan's

parked car, Leonard prevented her from leaving and was instrumental in facilitating the

assault. (See *People v. Prettyman, supra*, 14 Cal.4th at p. 259.) This evidence is

sufficient to support Leonard's conviction. (See *People v. Williams, supra*, 26 Cal.4th at

p. 788.)

Unlike *People v. Duke* (1985) 174 Cal.App.3d 296, on which Leonard relies, the

jury here could reasonably conclude the force threatened against Jordan (and actually

applied to her) was likely to produce great bodily injury. In *Duke*, the evidence

established only that the defendant had put the victim in a headlock "momentarily and

released her almost immediately." (*Id.* at p. 303.) In that court's view, the victim "was in

---

8       The prosecutor argued, "Did X aid and abet an assault with force which could
cause great bodily injury on [Jordan] when he wheeled his cart, his go[-]cart wheelchair
in back of her car so she couldn't leave and his associates come, break the car window
while she's seated in there, slashed the tires, then drag her out, take her into the room?"
The fact that the prosecutor did not specifically mention slamming Jordan to the ground
before taking her to Leonard's room is of no moment.

no danger from the force actually exerted on her body." (*Ibid.*) Here, by contrast, Jordan was surrounded by men, at least one of whom swung his fist towards her with force sufficient to smash a car window. She was then dragged out of the car and slammed to the ground. The jury was entitled to find this force created a sufficient likelihood of great bodily injury, even in the absence of evidence that injury resulted. (See *People v. Aguilar, supra*, 16 Cal.4th at p. 1028.)

C

Walser contends that the evidence was insufficient to convict him of pandering Jordan or Hanson. Under the charged statute, pandering is conduct that "[b]y promises, threats, violence, or by any device or scheme, causes, induces, persuades, or encourages another person to become a prostitute." (§ 266i, subd. (a)(2).) "The language of the pandering statute describes current conduct on the part of the defendant: inducing and encouraging. That current conduct is aimed at producing subsequent conduct by the target: that the target thereafter engage in acts of prostitution following a defendant's inducement or encouragement." (*People v. Zambia* (2011) 51 Cal.4th 965, 975 (*Zambia*).) The "proscribed activity of encouraging someone 'to become a prostitute,' as set forth in section 266i, subdivision (a)(2), includes encouragement of someone who is already an active prostitute . . . ." (*Id.* at p. 981.) The prosecution proceeded against Walser on the theory that he aided and abetted Leonard's pandering of Jordan and Hanson.

Walser contends that he could not have been convicted of pandering because there was no evidence Walser aided or abetted Leonard before the crime of pandering was

28

completed as to either victim. "The statute is clear that the crime of pandering is complete when the defendant 'encourages another person to become a prostitute' by 'promises, threats, violence, or by any device or scheme . . . .' (§ 266i, subd. (a)(1).)" (*Zambia, supra*, 51 Cal.4th at p. 981, fn. 8.) "It is settled that if a defendant's liability for an offense is predicated upon the theory that he or she aided and abetted the perpetrator, the defendant's intent to encourage or facilitate the actions of the perpetrator 'must be formed *prior to or during* "commission" of that offense.' " (*People v. Montoya* (1994) 7 Cal.4th 1027, 1039.) "In this respect, not only must the subjective intent to encourage or facilitate the actions of the perpetrator be formed prior to or during the commission of the offense, if there is no participation in the planning, the aider and abettor must take affirmative action at the time the offense is committed." (*People v. Joiner* (2000) 84 Cal.App.4th 946, 967.)

Walser's argument confuses the point at which a crime is completed for purposes of liability with the point at which commission of a crime ceases in the context of aiding and abetting. The two points need not be the same. " '[A]n offense may have been "committed," so as to subject its perpetrator to liability for the completed offense as opposed to an attempt to commit it, but still remain in progress for purposes of determining aider and abettor liability.' " (*People v. Felton* (2004) 122 Cal.App.4th 260, 270; see also *People v. Montoya, supra*, 7 Cal.4th at p. 1039.)

"[B]oth pimping and pandering have been held to be crimes of a continuous ongoing nature . . . ." (See *People v. Dell* (1991) 232 Cal.App.3d 248, 265-266 (*Dell*); see also *People v. White* (1979) 89 Cal.App.3d 143, 151 (*White*).) Walser could therefore

29

join in the pandering of Jordan and Hanson as an aider and abettor as long as the pandering remained ongoing. (See *People v. Felton, supra*, 122 Cal.App.4th at p. 271.) *Felton* considered an analogous continuous course of conduct crime, felony child endangerment. (*Ibid.*) The court explained, "[the perpetrator's] offense was 'complete,' for purposes of her guilt, the moment she left the baby with defendant. However, it was not 'complete,' for purposes of aider and abettor liability, until she returned home," i.e., when the child endangerment ceased. (*Ibid.*) The evidence of Walser's violence, threats, and intimidation during the course of Leonard's pandering of Jordan and Hanson is therefore sufficient to support Walser's conviction.

Walser disputes the characterization of pandering as a continuous course of conduct crime in *Dell* and *White*. He argues that neither *Dell* nor *White* considered the specific charge at issue here: pandering by encouragement under section 266i, subdivision (a)(2). He claims that pandering by encouragement differs from other types of pandering that have been characterized as course of conduct crimes. For example, the court in *White* considered the crime of pandering in which a defendant "[p]rocures for another person a place as an inmate in a house of prostitution . . . ." (Former § 266i, subd. (c), now § 266i, subd. (a)(3).) The court held "once the female is procured for a house of prostitution, the one offense becomes ongoing as long as the female plies her trade in such house." (*White, supra*, 89 Cal.App.3d at p. 151; see also *People v. Diedrich* (1982) 31 Cal.3d 263, 282 [citing *White* for the proposition that "pandering" is a continuous and ongoing offense].)

30

In determining whether the crime can be a continuous or ongoing offense, we discern no relevant difference between the type of pandering at issue in *White* and the type charged here. "The subdivisions of the [pandering] statute do not state different offenses but merely define the different circumstances under which the crime of pandering may be committed." (*People v. Lax* (1971) 20 Cal.App.3d 481, 486.) The pandering at issue in *White* is completed when the victim is procured for the house of prostitution, and it continues as long as the victim remains in the house and works as a prostitute. (*White, supra*, 89 Cal.App.3d at p. 151.) Here, the charged pandering is completed once the victim is encouraged to become a prostitute (*Zambia, supra*, 51 Cal.4th at p. 981, fn. 8), and it continues as long as the intended prostitution continues. Contrary to Walser's contention, encouraging a person to become a prostitute is no more an individualized act than procuring for a person a place in a house of prostitution, which *White* held was an ongoing offense. (*White,* at p. 151.)

*People v. DeLoach* (1989) 207 Cal.App.3d 323 does not alter this analysis. In that case, the defendant was convicted of two counts under section 266i, subdivision (a)(2), for encouraging her daughter to become a prostitute on two separate occasions, 20 days apart. (*DeLoach,* at p. 332.) On appeal, the defendant argued that pandering was "an 'ongoing offense'; once [defendant] had pandered her daughter the first time, 'any acts of prostitution by [daughter] subsequent to her becoming a prostitute did not, by themselves, give rise to separate counts of pandering.' " (*Ibid*.) The court characterized defendant's argument as follows: "Appellant's argument is based on the apparent premise that once a person has performed an act of prostitution, even though done under compulsion and

31

duress, that person is irrevocably branded as a prostitute." (*Ibid.*) The court disagreed, noting that "[t]he interpretation of Penal Code section 266i urged by appellant would require us to stigmatize the victim in this case . . . with a new form of Scarlet Letter." (*Id.* at p. 334.)

*DeLoach* did not consider whether pandering by encouragement under section 266i, subdivision (a)(2), could be an ongoing offense. Under the facts presented there, the court in *DeLoach* held that two separate charges of pandering by encouragement were sufficiently distinct and supported. The facts presented here are far different. Our conclusion that pandering by encouragement can be an ongoing offense does not necessarily mean pandering by encouragement must be charged as a single, ongoing offense under all factual scenarios. (See *People v. Napoles* (2002) 104 Cal.App.4th 108, 116 ["Of course, child abuse is not invariably charged as a course of conduct offense; one act or omission constituting abuse may be sufficient for conviction."].)

Walser further contends the evidence is insufficient to support his conviction of pandering Jordan because none of Walser's violence was directed specifically at Jordan. Jordan testified she remained with Leonard because of Leonard's threats. Jordan knew Walser was the enforcer of those threats, and she witnessed Walser beating Hanson on at least one occasion at Leonard's direction. Moreover, Walser took pictures of Jordan for advertisements on adult-oriented Web sites, and the evidence showed Walser was aware that the reason for the pictures and the advertisements was prostitution. Walser's e-mail address was found in the account information for one or two of the advertisements.

32

Based on this evidence, the jury could reasonably find Walser's actions aided and abetted Leonard's pandering of Jordan and were intended to do so.

## III

In a related argument, Walser contends the trial court erred by not instructing the jury that it must unanimously agree on which act or acts formed the basis of Walser's liability for pandering. "In a criminal case, a jury verdict must be unanimous." (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) "Additionally, the jury must agree unanimously the defendant is guilty of a *specific* crime. [Citation.] Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act." (*Ibid.*) "When the prosecutor does not make an election, the trial court has a sua sponte duty to instruct the jury on unanimity." (*People v. Mayer* (2003) 108 Cal.App.4th 403, 418.)

" 'Neither instruction nor election are required, however, if the case falls within the continuous course of conduct exception.' " (*People v. Avina* (1993) 14 Cal.App.4th 1303, 1309.) This exception applies where " 'the statute contemplates a continuous course of conduct of a series of acts over a period of time[,]' " including pimping and pandering. (*Ibid.*; see also *Dell, supra*, 232 Cal.App.3d at pp. 265-266 ["Most significantly, both pimping and pandering have been held to be crimes of a continuous ongoing nature and are therefore not subject to the requirement the jury must agree on the specific act or acts constituting the offense."].)

33

As discussed *ante*, we conclude that the charged offense, pandering by encouragement, can be a crime of continuous ongoing nature. (See *White, supra*, 89 Cal.App.3d at p. 151.) The language of the charging document, specifying that the acts of pandering took place over a specified period of time, reflects that the prosecution intended to charge Walser in this manner. (See *People v. Ewing* (1977) 72 Cal.App.3d 714, 717.) "This language alerts the jury that the charge consists of a continuous course of conduct, to be proved by evidence of more than one individual act." (*People v. Napoles, supra*, 104 Cal.App.4th at p. 117.) Likewise, although the evidence presented at trial included discussion of several discrete events, the bulk of the evidence was directed towards a continuous course of threats and intimidation directed at Jordan and Hanson. (See *ibid.*) Walser, in particular, was described by his *status* as Leonard's "strong arm" and his "enforcer" over this period. We therefore are not persuaded by Walser's claim that the evidence at trial showed a series of distinct criminal acts that precluded a finding of continuous conduct. (See *People v. Rae* (2002) 102 Cal.App.4th 116, 123-124.) A unanimity instruction was not required. (See *Ewing,* at p. 717; *Napoles,* at p. 117; *Dell, supra*, 232 Cal.App.3d at p. 266.) Because we conclude the trial court did not err, we need not consider Walser's additional arguments regarding prejudice.

IV

Leonard contends the court erred by allowing Detective Hunter to give expert testimony regarding the culture of pimping and pandering, including his interpretation of Leonard's social media postings and the victims' statements against Leonard. Leonard

argues Detective Hunter's testimony invaded the fact-finding province of the jury by commenting on Leonard's guilt or innocence.

Detective Hunter was the prosecution's first witness at trial. He had spent 18 years as a police officer, including six years in the vice operations unit of the SDPD. He developed the SDPD's first training program on pimping and pandering and taught the subject hundreds of times. Among other subjects, he testified at trial regarding the ways pimps control the prostitutes who work for them. Some pimps are "finesse pimps," who use promises of money, jewelry, travel, and love as tools of control. Other pimps are "gorilla pimps," who rely on violence and threats. During Detective Hunter's testimony, the prosecutor asked, "And have you, in your speaking with [Jordan], as well as reviewing the reports in this case and the cell phone examination and any other evidence, . . . have you formed an opinion as to what type of pimp Mr. X or Louis Leonard is?" Detective Hunter answered affirmatively, and he explained that "[i]t started out in the beginning as a finesse pimp in their relationship, and it easily developed into a gorilla pimping relationship."

Later, following Hanson's testimony, Detective Hunter was recalled. The prosecutor referenced Detective Hunter's previous testimony and asked, "Relating with that subject area, did you see patterns of behavior in pimping in manipulation and control of women in the testimony you heard today?" Detective Hunter answered, "Yes." Detective Hunter also explained that certain postings of Leonard's social media referenced pimping and prostitution and that Leonard's style mimicked successful pimps.

35

"California law permits a person with 'special knowledge, skill, experience, training, or education' in a particular field to qualify as an expert witness (Evid. Code, § 720) and to give testimony in the form of an opinion (*id.*, § 801)." (*People v. Gardeley* (1996) 14 Cal.4th 605, 617.) An expert's opinion must be "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) "Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact." (*Id.*, § 805.)

However, " '[a] witness may not express an opinion on a defendant's guilt. [Citations.] The reason for this rule is not because guilt is the ultimate issue of fact for the jury, as opinion testimony often goes to the ultimate issue. [Citations.] "Rather, opinions on guilt or innocence are inadmissible because they are of no assistance to the trier of fact. To put it another way, the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt." ' " (*People v. Vang* (2011) 52 Cal.4th 1038, 1048.) We review the trial court's decision to admit expert testimony for abuse of discretion. (*People v. Prince* (2007) 40 Cal.4th 1179, 1223.)

Here, Detective Hunter's testimony regarding what type of pimp Leonard was and what "patterns of behavior in pimping" were shown in Hanson's testimony could reasonably be interpreted as unhelpful comments on Leonard's guilt or innocence on the

36

charge of pimping.9  (See *People v. Brown* (1981) 116 Cal.App.3d 820, 829 [testimony that defendant acted as a " 'runner' " "was tantamount to an opinion that [defendant] was guilty of the charged crime"].)  The jury was as qualified as Detective Hunter to determine whether the evidence showed Leonard was acting as a "gorilla pimp" or "finesse pimp," for example, after Detective Hunter had explained those terms.  (See *ibid.*; see also *People v. Vang, supra*, 52 Cal.4th at p. 1048.)

However, even assuming the trial court abused its discretion in admitting this testimony, any error was harmless.  (See *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)10  The improper testimony cited by Leonard was brief, and remaining evidence against Leonard was overwhelming.  The additional effect on the jury from the allegedly improper testimony, if any, was negligible.  We are not persuaded by Leonard's claim that prejudice may be found in the jury's unfamiliarity with the culture of pimping and pandering and in the alleged dispute regarding Leonard's pimping role engendered by his emotional relationship with Jordan and Hanson.  Moreover, the trial court properly instructed the jury with CALCRIM No. 332, which reminded the jury that they need not

---

9    We do not place Detective Hunter's testimony on Leonard's social media postings and style in this category.  Detective Hunter's testimony regarding the meaning of this evidence, in the culture of pimping and pandering, did not comment on Leonard's guilt or innocence.  For example, testifying Leonard's style of dress or accessories mimicked those of a successful pimp is not the same testifying that Leonard was in fact a pimp.  The court did not err in admitting this testimony.

10    Leonard contends this error should be reviewed under the federal standard for prejudice under *Chapman v. California* (1967) 386 U.S. 18, but he has not established any grounds for this heightened review.  (See *People v. Pearson* (2013) 56 Cal.4th 393, 446 [erroneous admission of expert testimony reviewed under *Watson* standard of prejudice].)  Even under the *Chapman* standard, however, we would find the error harmless beyond a reasonable doubt.

accept Detective Hunter's testimony as true or correct. The jury was told, "You must decide whether information on which the expert relied was true and accurate. You may disregard any opinion that you find unbelievable, unreasonable or unsupported by the evidence." Considering this instruction, and after reviewing the entire record, we conclude Leonard has not established prejudicial error.

V

A

Leonard and Walser argue the court improperly limited their cross-examinations of Jordan and Hanson. As to Jordan, Leonard and Walser claim they should have been able to explore Jordan's alleged complaints to the police regarding other pimps to show bias. As to Hanson, Leonard and Walser claim they should have been able to introduce evidence of Hanson's conviction for evidence tampering (destroying a methamphetamine pipe) to undermine her credibility.

"Except as otherwise provided by statute, all relevant evidence is admissible." (Evid. Code, § 351.) " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (*Id.*, § 210.)

"The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) "Rulings under Evidence Code

38

section 352 come within the trial court's discretion and will not be overturned absent an abuse of that discretion."  (*People v. Minifie* (1996) 13 Cal.4th 1055, 1070.)

B

During Jordan's testimony, Walser's counsel sought to ask her if she had accused "at least one other person" of pimping and mistreating prostitutes and if she intended to "wage some kind of crusade against pimps" in San Diego.  The trial court sustained objections to both questions on relevance and other grounds.  Leonard's counsel asked if Jordan had told Detective Hunter that she was pursuing a case against another pimp.  The trial court again sustained the prosecutor's objection, this time on hearsay grounds.

Later, Walser's counsel asked the court to revisit its evidentiary rulings.  Walser's counsel claimed he wanted to show that Jordan was "on some kind of a campaign" against pimps in San Diego.  After discussion, the trial court determined the proposed inquiry was inadmissible under Evidence Code, section 352.  The court stated, "I don't think -- I think it has very marginal relevance and it's -- it would be way too time consuming to deal with that issue.  There's plenty of ammunition that you have used and can use against [Jordan].  And so I don't think it really helps in any significant way." During Detective Hunter's testimony, Leonard's counsel asked whether Jordan had told him she was working on other cases against pimps.  The court sustained the prosecutor's objection on relevance grounds.

The trial court did not err by excluding this evidence under Evidence Code, section 352.  The relevance of this evidence, if any, was marginal.  Unlike *People v. Stewart* (1983) 145 Cal.App.3d 967, on which Walser relies, the evidence here was not

39

directed toward Jordan's alleged bias against the defendants but toward Jordan's complaints in unrelated cases. (*Id.* at p. 977.) Jordan already testified she had reported Leonard and Walser to police and that she was testifying pursuant to an immunity agreement. Any bias based on those facts was already before the jury. The fact Jordan made other reports, or that she was on an alleged "crusade" against pimps in San Diego, would add little to her alleged bias. But exploration of Jordan's other reports, and the bases therefor, held the potential to consume a disproportionate amount of time at trial and confuse the issues before the jury. The trial court properly excluded the evidence.

Contrary to Leonard and Walser's contentions, the application of Evidence Code, section 352 does not violate their due process rights. (See *People v. Riccardi* (2012) 54 Cal.4th 758, 809 ["The routine and proper application of state evidentiary law does not impinge on a defendant's due process rights."].) "Although the complete exclusion of evidence intended to establish an accused's defense may impair his or her right to due process of law, the exclusion of defense evidence on a minor or subsidiary point does not interfere with that constitutional right." (*People v. Cunningham* (2001) 25 Cal.4th 926, 999.) Under the circumstances here, Leonard and Walser have not established any violation of their due process rights.

Even had Leonard and Walser shown the court erred in excluding evidence of Jordan's other reports and her alleged "crusade" against pimps in San Diego, any error was harmless under both the federal and California standards. (See *Chapman v. California, supra*, 386 U.S. at p. 24; *Watson, supra*, 46 Cal.2d at p. 836.) There was ample evidence of Jordan's animosity towards Leonard and Walser, so any additional

40

effect on the jury of evidence of potential animosity towards other pimps would be negligible. Unlike *People v. Stewart, supra*, 145 Cal.App.3d at page 977, and *People v. Allen* (1978) 77 Cal.App.3d 924, 929, both cited by Walser, the evidence Leonard and Walser sought to introduce would not have provided the jury with any additional significant reason to suspect Jordan's testimony. Independent evidence also corroborated Jordan's testimony, including Internet advertisements (some with Walser's e-mail address), Leonard's social media postings, Jordan's pretext calls with Leonard, and Hanson's testimony. Leonard and Walser have not established prejudicial error.

C

Prior to trial, the court and counsel discussed the admissibility of prior criminal convictions as impeachment against Hanson. Although the court allowed Leonard and Walser to put into evidence seven or eight prior felony convictions, the court excluded evidence of Hanson's conviction in Florida for evidence tampering. The court and counsel believed this latter crime to be a misdemeanor, although Leonard and Walser argue on appeal that it was in fact a felony. The trial court explained its reasoning as follows:

> "THE COURT: Well, I think that we can't -- I mean like I said, I have a big problem with getting into details of misdemeanors. And so we don't have the conduct to put on what the conduct was. I suspect what it was she tossed the dope over the fence or something.
>
> "[THE PEOPLE]: She stepped on a meth pipe or crack pipe.
>
> "THE COURT: Yeah. So that -- it sounds a lot more sordid than it really is. And since I'm not letting misdemeanor conduct come in against your client [Leonard], I'm not going to let misdemeanor

41

conduct come in against her.  Like you said, she has a long and
storied felony record . . . ."

Later, during Hanson's testimony, Walser's counsel renewed his request to put her

conviction before the jury.  The court again rejected the request, calling the proposed

evidence "trivial" and excluding it under Evidence Code, section 352.

"[I]f past criminal conduct amounting to a misdemeanor has some logical bearing

upon the veracity of a witness in a criminal proceeding, that conduct is admissible,

subject to trial court discretion . . . ."  (*People v. Wheeler* (1992) 4 Cal.4th 284, 295.)

"When the witness subject to impeachment is not the defendant, those factors [guiding

the court's discretion] prominently include whether the conviction (1) reflects on honesty

and (2) is near in time."  (*People v. Clair* (1992) 2 Cal.4th 629, 654.)  However, "the

latitude [Evidence Code] section 352 allows for exclusion of impeachment evidence in

individual cases is broad.  This statute empowers courts to prevent criminal trials from

degenerating into nitpicking wars of attrition over collateral credibility issues."  (*Wheeler,*

at p. 296.)  " '[C]ourts may and should consider with particular care whether the

admission of such evidence might involve undue time, confusion, or prejudice which

outweighs its probative value.' "  (*People v. Clark* (2011) 52 Cal.4th 856, 932.)

Even assuming Hanson's conviction for evidence tampering involved moral

turpitude and had some probative value, we conclude the trial court did not abuse its

discretion in excluding it.  Given the circumstances of Hanson's offense, its probative

value was slight and the nature of the crime potentially misleading.  The trial court did

not err in determining that admission of the evidence would consume time and effort to

42

get "into details of misdemeanors" that would substantially outweigh its probative value. (See *People v. Wheeler, supra*, 4 Cal.4th at pp. 296-297.)  The trial court did not arbitrarily exclude the conviction because it was alleged to be a misdemeanor, as Leonard contends.  Instead, it properly exercised its discretion under Evidence Code, section 352.[11]  Contrary to Leonard's contention, that section may be invoked to exclude a felony or misdemeanor offense even if it has resulted in a conviction.  (*People v. Castro* (1985) 38 Cal.3d 301, 312-313; *Wheeler,* at p. 295.)

Moreover, exclusion of such evidence did not violate Leonard's or Walser's due process rights.  (See *People v. Riccardi, supra*, 54 Cal.4th at p. 809; see also *People v. Brown* (2003) 31 Cal.4th 518, 545 ["Moreover, reliance on Evidence Code section 352 to exclude evidence of marginal impeachment value that would entail the undue consumption of time generally does not contravene a defendant's constitutional rights to confrontation and cross-examination."].)  Given the ample evidence regarding Hanson's credibility offered at trial, Leonard and Walser have not shown that introducing the conviction at issue here " 'would have produced "a significantly different impression of [the witness's] credibility" ' " as required to state a constitutional violation.  (See *People v. Virgil* (2011) 51 Cal.4th 1210, 1251.)

---

11     The trial court's apparent belief that the misdemeanor could not be proved through the record of conviction also does not establish error.  Even if the court was mistaken in its belief, the thrust of the court's concern was that the misdemeanor conviction itself was not evidence of impeachment; the underlying conduct must be proven, as Leonard concedes.  (See *People v. Chatman* (2006) 38 Cal.4th 344, 373.)  The time and effort required to present, explain, and address the evidence establishing proof of the underlying conduct was a proper basis for exclusion under Evidence Code, section 352.

Even had Leonard and Walser shown the court erred in excluding evidence of Hanson's conviction under Evidence Code, section 352, any error was harmless under both the federal and California standards. (See *Chapman v. California, supra*, 386 U.S. at p. 24; *Watson, supra*, 46 Cal.2d at p. 836.) Leonard and Walser introduced ample evidence addressing Hanson's credibility at trial, including her prior felony convictions, prior prison time, immunity agreement, and prostitution work. Hanson testified regarding a recent felony arrest for possession of controlled substances. During the arrest, Hanson said, she smashed the drugs in her possession "into crumbs" so that the police "could not tell how much" she had. Thus, analogous conduct showing alleged moral turpitude was before the jury even absent admission of Hanson's prior conviction. Moreover, Hanson's incriminating testimony against Leonard and Walser was corroborated by independent evidence, including Jordan's testimony, text messages from Leonard to Hanson discussing prostitution, and Internet advertisements for Hanson with pictures from Leonard's apartment or near his car. We therefore conclude Leonard and Walser have not established prejudicial error.[12]

## VI

### A

Leonard and Walser argue the court should have stayed their sentences on their convictions for assault (Leonard and Walser) and making a criminal threat (Leonard

---

[12] We further reject Leonard's general claim that this potential error, combined with others, cumulatively establishes prejudicial error. (See *People v. Cunningham*, *supra*, 25 Cal.4th at p. 1009.) Each of the potential errors we have considered is harmless for the reasons stated, whether considered individually or collectively.

only) under section 654.  "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  (§ 654, subd. (a).)  The prohibition on multiple punishments in section 654 extends to a single act or an indivisible course of conduct.  (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208 (*Latimer*).)  " 'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the *intent and objective* of the actor.  If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' "  (*Ibid.*)

"If [a defendant] entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct."  (*People v. Beamon* (1973) 8 Cal.3d 625, 639 (*Beamon*).)  "[A] course of conduct divisible in time, although directed to one objective, may [also] give rise to multiple violations and punishment."  (*Id.* at p. 639, fn. 11; see also *Latimer, supra*, 5 Cal.4th at p. 1212.)

Leonard and Walser may raise the applicability of section 654 on appeal even if no objection was made in the trial court.  (*People v. Scott* (1994) 9 Cal.4th 331, 354, fn. 17.)  We review the trial court's implied determination that section 654 does not apply for substantial evidence.  (*People v. Brents* (2012) 53 Cal.4th 599, 618; see also *People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.)

45

B

Leonard argues the sentences for his assault and threat against Jordan should be stayed under section 654 based on his conviction and sentence for pandering Jordan. Although we conclude in part II.C., *ante*, that pandering by encouragement can be a continuous and ongoing offense, substantial evidence supports a finding that the crime of pandering here had ceased by the time Jordan was assaulted and threatened. Jordan had been away from Leonard for over a month in a drug rehabilitation program. She returned to his apartment because she wanted to talk with him. Leonard's objective was therefore not to continue the prior pandering, but to force Jordan to work for him anew. On these facts, application of section 654 would be inappropriate. (See *Beamon, supra*, 8 Cal.3d at p. 639; see also *People v. Louie* (2012) 203 Cal.App.4th 388, 399.)

Leonard argues the language of the charging document, which specified that the pandering occurred over dates that encompass the assault and threat, establishes that section 654 must apply, absent a contrary finding by the jury. The authorities Leonard cites do not support his argument. *People v. Riskin* (2006) 143 Cal.App.4th 234, 244-245, and *People v. Hiscox* (2006) 136 Cal.App.4th 253, 256, rely on the ex post facto clauses of the California and federal Constitutions to hold that sentencing under a newly effective statute could not occur absent evidence at trial that the charged offense took place after the effective date of the new statute. Here, by contrast, the evidence at trial showed Leonard's pandering of Jordan had ceased by the time of the assault and threat. (See *People v. Centers* (1999) 73 Cal.App.4th 84, 101 ["Ordinarily, in determining whether Penal Code section 654 applies, the trial court is entitled to make any necessary

46

factual findings not already made by the jury."].) Moreover, the ex post facto concerns that animated the decisions in *Riskin* and *Hiscox* are not present here.

Similarly, the prosecutor's reference during his closing argument to the threat against Jordan in the context of pandering does not compel the application of section 654 to Leonard's sentence for the threat. The prosecutor's statements are not evidence, and they are not binding on the jury or the court. (See *People v. Perez, supra*, 2 Cal.4th at p. 1126; see also *People v. Centers, supra*, 73 Cal.App.4th at p. 101.) Leonard's attempt to characterize the prosecutor's statement as a binding judicial admission is unpersuasive. (Cf. *Fassberg Const. Co. v. Housing Authority of City of Los Angeles* (2007) 152 Cal.App.4th 720, 752.)

C

Walser argues the sentence for his assault on Hanson should be stayed under section 654 based on his conviction for pandering Hanson. Substantial evidence supports the finding that the crime of pandering of Hanson had also ceased by the time she was picked up on the street by Leonard and Walser and assaulted. Hanson testified she had left Leonard and developed a relationship with another man. She did not return to Leonard; instead Leonard and Walser came to her after she left. Walser told her she needed to "come home" and should not have run away. When they arrived at Leonard's apartment, Leonard and Walser beat Hanson severely. Because her relationship with Leonard and Walser had ceased prior to that point, the assault was not part of the same indivisible course of conduct as the pandering. Section 654 does not apply. (See

47

*Beamon, supra*, 8 Cal.3d at p. 639; see also *People v. Louie, supra*, 203 Cal.App.4th at p. 399.)

Walser argues *Latimer* supports his contention that section 654 should apply here. In *Latimer*, the defendant abducted the victim, drove her to a nearby desert area, and raped her twice. (*Latimer, supra*, 5 Cal.4th at p. 1206.) The defendant pleaded nolo contendere to one count of kidnapping and two counts of forcible rape. (*Ibid.*) On appeal, he contended his sentence for the kidnapping conviction should be stayed under section 654. The Supreme Court agreed. "Although the kidnapping and the rapes were separate acts, the evidence does not suggest any intent or objective behind the kidnapping other than to facilitate the rapes." (*Latimer,* at p. 1216.)

Unlike *Latimer*, the evidence here does not show a single continuous and indivisible transaction. The assault against Hanson could not have been intended to facilitate the prior pandering because that course of conduct had ceased. Walser harbored a new criminal intent and objective: evidently to facilitate a new round of pandering, but potentially simple retribution. Walser could therefore be punished separately for the resulting crime of assault. Walser's reliance on the prosecution's closing argument, which mentioned the assault of Hanson in the context of pandering, is unpersuasive for the same reasons we explained with respect to Leonard's similar contention, *ante*.

## VII

### A

Leonard contends the trial court abused its discretion in declining to strike his prior conviction under *Romero* and thus sentencing him as a second strike offender. The

conviction at issue involved a 2001 altercation between Leonard and his children's babysitter. Leonard called her by phone and accused her of hiding Leonard's girlfriend at her house. He threatened to "knock her head off." When Leonard arrived at the babysitter's home to pick up his children, he said he would drop his children off and come back with a gun. He said he had friends who would get the babysitter if she was hiding his girlfriend. Leonard left and returned approximately two and a half hours later.

When Leonard returned, he yelled for his girlfriend. When nothing happened, he fired an unknown number of shots from a nine-millimeter semiautomatic handgun. Leonard was arrested a short time later in his car with the gun and a spent shell casing. His children were in the backseat. Leonard was convicted of negligent discharge of a firearm (§ 246.3) and two counts of child abuse (§ 273a, subd. (a)). The court sentenced Leonard to probation. He did not complete probation and was sentenced to three years in prison.

Leonard's counsel here argued the trial court should exercise its discretion, in the interests of justice, to strike this prior conviction allegation for purposes of the three strikes law. He argued the prior offense was remote in time and qualitatively different from his current offenses. Leonard's counsel claimed no weapon was used in the current offenses. He also emphasized Leonard's age (46) and physical disability. The prosecution opposed, arguing Leonard's crimes showed an escalation of sophistication and violence towards women.

The trial court noted Leonard had been involved in a variety of criminal activity starting in 1991. He had numerous drug convictions, as well as a conviction for spousal

49

abuse. Although Leonard had no prior convictions for pimping or pandering, the trial court considered his social media posting ("[June 4, 1967], a pimp was born") to be evidence he had considered himself a pimp for a long time. The trial court agreed with the prosecution that Leonard had an escalating record of offenses and violence.

Responding to Leonard's counsel's argument, the trial court said "no weapon was used in this case because Mr. Leonard is apparently not capable of handling a weapon too well at this juncture in his life, but he used a weapon in the past." The trial court stated that "now the weapon he used is Mr. Walser."

The court found the circumstances of Leonard's prior conviction, committing the offense in front of his children, were significant and "very serious." The court further commented as follows: "He has not done anything particularly productive since then to improve himself. And he's descended into -- deeper and deeper into the pimp life since that happened. And I suspect that that whole incident back in 2001 had a lot to do with pimping, too, and the woman he was trying to find was probably one of the women working for him."

B

"[A] trial court may strike or vacate an allegation or finding under the Three Strikes law that a defendant has previously been convicted of a serious and/or violent felony, on its own motion, 'in furtherance of justice' pursuant to . . . section 1385(a)." (*Williams*, *supra*, 17 Cal.4th at p. 158.) "[I]n ruling whether to strike or vacate a prior serious and/or violent felony conviction allegation or finding under the Three Strikes law . . . the court in question must consider whether, in light of the nature and

50

circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*Id.* at p. 161.) "[A] trial court's refusal or failure to dismiss or strike a prior conviction allegation under section 1385 is subject to review for abuse of discretion." (*People v. Carmony* (2004) 33 Cal.4th 367, 375 (*Carmony*).)

Leonard argues the trial court abused its discretion by relying on two factors allegedly unsupported by the evidence: first, the 2001 conviction was related to pimping; and second, Leonard is currently not capable of handling a firearm "too well."[13] "A trial court abuses its discretion when the factual findings critical to its decision find no support in the evidence." (*People v. Cluff* (2001) 87 Cal.App.4th 991, 998.)

We conclude the court's factual findings are supported by the record. As the court noted, Leonard himself wrote "[June 4, 1967], a pimp was born," and thus it is reasonable to infer that he had considered himself a pimp for a long time. This fact, combined with the hostility to women shown in the prior conviction, adequately raises the suspicion noted by the trial court that the 2001 conviction had something to do with pimping. The fact that the records of the 2001 conviction itself do not mention pimping is insufficient to rebut this reasonable inference.

---

13    Relying on *People v. Scott, supra,* 9 Cal.4th 331, the Attorney General contends Leonard forfeited these claims of error on appeal by not objecting to the trial court's reliance on these factors. Given our discussion of the merits, we need not address whether Leonard forfeited these claims.

Similarly, the evidence showed Leonard required assistance with daily activities, including bathing and dressing. These facts provide ample support for the trial court's conclusion that Leonard could not handle a firearm "too well" at this point in his life. Contrary to Leonard's contention, the fact he was able to drive his car does not compel the conclusion that he could also handle a firearm well.

Even if the evidence failed to support these two factors, Leonard would not have established prejudicial error. These factors were not "critical to its decision" because other considerations—sufficient in themselves—supported the court's refusal to dismiss Leonard's prior conviction allegation. (See *People v. Cluff, supra*, 87 Cal.App.4th at p. 998.) These factors were also not "impermissible" for the trial court to consider, such as bias related to a defendant's race or national origin. (See *Carmony, supra*, 33 Cal.4th at p. 378; see also *People v. Gillispie* (1997) 60 Cal.App.4th 429, 435.) This is not a case in which the trial court was unaware of its discretion to dismiss the prior conviction allegation. (See *Carmony,* at p. 378.)

In general, "[w]hen a trial court has given both proper and improper reasons for a sentence choice, a reviewing court will set aside the sentence only if it is reasonably probable that the trial court would have chosen a lesser sentence had it known that some of its reasons were improper." (*People v. Price* (1991) 1 Cal.4th 324, 492.) Contrary to Leonard's contention, that asserted error does not amount to a violation of due process under the federal or California Constitutions. (See *Price,* at p. 492.) Given the trial court's comments, and the evidence in the record, there is no reasonable possibility that the trial court would have stricken Leonard's prior conviction allegation had the two

52

factual findings in question been discarded. Remand for resentencing is not required. (See *ibid.*)

Leonard further contends the trial court placed "undue weight" on the seriousness of the prior conviction. The trial court should consider the "the nature and circumstances of his . . . prior serious and/or violent felony convictions," and the court properly did so here. (See *Williams, supra*, 17 Cal.4th at p. 161.) The record does not reflect that the trial court placed any more weight on this consideration than warranted. Because " 'the record demonstrates that the trial court balanced the relevant facts and reached an impartial decision in conformity with the spirit of the law,' " we will not question the trial court's conclusion on appeal. (See *Carmony, supra*, 33 Cal.4th at p. 378.)

## VIII

Leonard argues the court's abstract of judgment erroneously states his prison prior was stayed, rather than stricken as the court orally ordered. The court's oral pronouncement of Leonard's sentence controls subsequent written judgments and orders. (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185; see also *People v. Mesa* (1975) 14 Cal.3d 466, 471.) The Attorney General does not disagree. We will therefore modify the judgment to conform to the court's oral pronouncement.

## DISPOSITION

The judgment against Leonard is modified by striking his prison prior under section 667.5, subdivision (b). As so modified, the judgment is affirmed. The trial court is directed to prepare an amended abstract of judgment and forward it to the Department of Corrections and Rehabilitation.

The judgment against Walser is affirmed.

McDONALD, Acting P. J.

WE CONCUR:

McINTYRE, J.

AARON, J.

54

Filed 7/29/14

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D062660 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD239290) |
| LOUIS VAN LEONARD et al., | ORDER CERTIFYING OPINION FOR PUBLICATION |
| Defendants and Appellants. | |

THE COURT:

The opinion filed July 18, 2014, is ordered certified for publication.

McDONALD, Acting P. J.

Copies to: All parties