Filed 2/3/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B306169 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA119397) |
| v. | |
| RICHARD BERT MENDOZA, JR., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Mike Camacho, Judge. Affirmed in part, vacated in part, and remanded with directions.

Christine Dubois, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Stephanie A. Miyoshi and Roberta L. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant Richard Bert Mendoza, Jr. (Defendant) appeals the judgment entered following a jury trial in which he was convicted of (1) attempted extortion (Pen. Code, §§ 664, 518);[1] (2) attempted robbery (§§ 664, 211); (3) assault with a deadly weapon (§ 245, subd. (a)(1)); (4) assault with force likely to cause great bodily injury (§ 245, subd. (a)(4)); (5) robbery (§ 211); (6) assault with a deadly weapon (§ 245, subd. (a)(1)); and (7) dissuading a witness (§ 136.1(b)(1)). The jury further found true the allegations of personal use of a deadly or dangerous weapon with respect to the first and second counts (§ 12022, subd. (b)(1)) and for inflicting great bodily injury with respect to the third and fourth counts (§ 12022.7, subd. (a)). The trial court imposed an aggregate sentence of 24 years and 4 months. Defendant contends: (1) his conviction for attempted extortion was unsupported by evidence; (2) he should not have been separately sentenced for distinct criminal acts committed during a continuous attack; and (3) multiple issues pertaining to the trial court's exercise of discretion in sentencing him require resentencing. We agree in limited part due to a change in the law, vacate a portion of Defendant's sentence, and remand for resentencing as set forth below.

## BACKGROUND

Defendant's convictions stem from two separate criminal episodes in the city of Pomona occurring weeks apart in 2018.

### The Spadra Cemetery Incident

On the evening of September 16, 2018, young cyclists on a group ride sought to take a shortcut through the Spadra

---

[1] Undesignated statutory references are to the Penal Code.

Cemetery.  As one of the group's leaders, Jeremy Chapa, was trying to locate a trail he wanted to use, Defendant emerged from the bushes and demanded to know what Chapa was doing there. Defendant's girlfriend, Valerie Gorostiza, emerged a few seconds later.

When he confronted Chapa, Defendant was holding a realistic replica revolver that Chapa believed at the time to be real.  Defendant approached Chapa and pointed the weapon at him.  Chapa explained his presence to Defendant and offered to leave immediately.  Instead of letting the cyclists pass, Defendant ordered Chapa to the ground and Chapa complied.  Defendant then put the weapon to Chapa's head.  When another cyclist, Jose Garcia, attempted to intervene, Defendant left Chapa and pistol-whipped Garcia in the face.  Garcia fell to the ground and Defendant returned to Chapa.  Defendant then ordered Chapa to hand over his backpack and empty his pockets.  Chapa complied, handing over his phone, hat, backpack, and wallet to Defendant who, in turn, handed them to Gorostiza.  Defendant then used another phone to photograph Chapa's I.D. and told Chapa that if he reported the incident to police or returned to the area he would "come into [Chapa's] house and make sure [he] paid for what [he] did."  Defendant then returned Chapa's backpack and wallet, but not his phone or hat, and demanded that Chapa leave.

Chapa reconvened with some of the other cyclists shortly thereafter and reported the incident to a 911 dispatcher using another cyclist's phone.  Police responded and Chapa provided a statement.

The next day, Pomona police officers went to the area where Chapa was robbed to investigate.  There, they encountered a homeless encampment occupied by Defendant, Gorostiza, and

3

two other adults. After speaking with Defendant, officers searched his duffel bag. In the bag, they found a realistic-looking replica revolver. Defendant explained that he had found it four or five days prior.

A few days later, Chapa spoke with a detective at the Pomona police station. He was shown photographs of a revolver, six women, and six men. From those photographs, he confirmed that the revolver in the photograph looked like the weapon Defendant used in the attack and identified a photograph of Gorostiza as looking similar to Defendant's companion at the cemetery. Chapa did not identify Defendant.

Officers arrested Defendant and Gorostiza at a park in Pomona several weeks later. At the time of his arrest, Defendant had two phones in his possession, one of which had photographs of Chapa's I.D. stored in its memory card. In prison phone calls he made while awaiting trial, Defendant discussed using knowledge of Chapa's address to make the charges against him "go away," and shared the address with various associates. Chapa lived at the address shown on his I.D. at the time of the Spadra Cemetery incident. However, Chapa no longer lived there at the time of Defendant's trial.

For his conduct in the Spadra Cemetery incident, the jury convicted Defendant of (i) robbery of Chapa (§ 211); (ii) assault of Garcia with a deadly weapon (§ 245, subd. (a)(1)); and (iii) dissuading Chapa as a witness (§ 136.1(b)(1)).

**The Attack On Michael Reyes**

Michael Reyes, an SSI recipient who lived with his parents, was at home on October 2, 2018, listening to music by his swimming pool. Defendant entered the property uninvited through a broken fence, tapped Reyes on the shoulder, and

4

demanded "Where is my fuckin' money?  Give me my fuckin money or I'm going to kill you."

Reyes interpreted this as a demand for the "tax" that Defendant collected from him every month.  For the approximately six years Reyes had lived in Pomona, he paid Defendant $100 on the first of each month—the same day his SSI benefits were funded.  He did so because Defendant told him, in Reyes's words, that Reyes had to pay "taxes to live in Pomona, like, to do stuff, like, to go around to stores and parks and something."  Reyes believed that Defendant was a gang member and that Defendant would "beat [Reyes] up or hurt [him] or something, hurt [his] family" if he did not pay the "taxes."  Even though Defendant used fear to induce Reyes to pay him $100 of his monthly SSI benefits, Reyes considered Defendant a friend and the two frequently drank beer and smoked cigarettes together at Reyes's house.

On the occasion of October 2, 2018, Defendant had only $5 on him, not the usual $100.  He gave Defendant the $5 to "calm him down" and told him he had to go inside to get more money.  Before Reyes had a chance to do so, however, Defendant attacked him.  Defendant first swung a knife at Reyes's midsection four times but did not injure him.  Then, he swung the knife at Reyes's face.  Reyes deflected the knife with his hand, sustaining a large laceration, but was "too slow" to block Defendant's subsequent punch.  That punch knocked out two of Reyes's teeth and caused profuse bleeding.  Defendant then relented and allowed Reyes to go inside his house.

In prison phone calls he made while awaiting trial, Defendant instructed associates to prevent Reyes from appearing at a court hearing in the matter.  After Reyes appeared and

testified at the hearing, Defendant instructed an associate to "talk to Gilly [another associate] ASAP and let him know what that fool did, homie. And let him know, fuckin', you know what I mean. I said talk to Diablo [another associate]."

For his conduct relative to Reyes on October 2, 2018, the jury convicted Defendant of (i) attempted extortion of Reyes (§§ 664, 518); (ii) attempted robbery of Reyes (§§ 664, 211); (iii) assault of Reyes with a deadly weapon (§ 245, subd. (a)(1)); and (iv) assault of Reyes with force likely to cause great bodily injury (§ 245, subd. (a)(4)).

For the various convictions stemming from the two separate incidents, the trial court imposed an aggregate term of 24 years and four months imprisonment. In accordance with section 1170.1, subdivision (a), the court based the principal term on Defendant's conviction for assaulting Reyes with a deadly weapon, as enhanced (i) for causing great bodily injury (§ 12022.7, subd. (a)); (ii) under the Three Strikes laws (§§ 1120.12, subds. (a)-(d) & § 667, subds. (b)-(i)); and (iii) for a prior conviction of a serious felony (§ 667, subd. (a)(1)). It imposed subordinate terms, subject to applicable enhancements, for all other convictions *other than* the attempted robbery and attempted extortion of Reyes. The court stayed sentences for the latter two convictions pursuant to section 654.

Defendant timely appealed.

## DISCUSSION

### I. Substantial Evidence Supported Defendant's Conviction For Extorting Reyes On October 2, 2018

Defendant argues the evidence was insufficient to support his conviction for attempted extortion, on the premise that Defendant's actions were inconsistent with an effort to obtain

6

Reyes's consent before using force on him.  Absent such effort, Defendant contends, his actions could be construed only as "simple robbery" to the exclusion of attempted extortion.  We find that the record supports Defendant's conviction for attempted extortion.

The test for determining a claim of insufficient evidence is whether, " 'on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citations.]' " (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)  We must interpret the evidence " 'in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.  [Citations.]' " (*Ibid.*)

Extortion is defined in section 518 as "the obtaining of property or other consideration from another, with his or her consent . . . induced by a wrongful use of force or fear . . . ." (§ 518, subd. (a).)  The "fear" element may be satisfied by, among other things, a threat "[t]o do an unlawful injury to the person or property of the individual threatened or of a third person." (§ 519, subd. 1.)[2]

_____

[2]     Consistent with these provisions, the jury was properly instructed that extortion, for the purposes of the People's attempted extortion charge, is made up of the following elements:

"1. The defendant threatened to unlawfully injure or used force against the property of another person or a third person; 2. When making the threat or using force, the defendant intended to use that fear or force to obtain the other person's consent to give the defendant money or property; 3. As a result of the threat or use of force, the

7

Defendant correctly notes that " '[t]he crime of extortion is related to and sometimes difficult to distinguish from the crime of robbery.' [Citation.]"  Like extortion, robbery involves obtaining property by "force or fear."  (§ 211.)  Unlike extortion, robbery also requires (i) felonious intent (i.e., the intent to permanently deprive the victim of his property); (ii) that the property be on or in the immediate presence of the victim; and (iii) that the property be obtained against the victim's will.  (*Ibid.*, see also *People v. Torres* (1995) 33 Cal.App.4th 37, 50 (*Torres*).)  Extortion requires none of these things but *does* require intent to induce the victim to part with property "with his or her consent."  (§ 518, subd. (a).)  However, the requisite "consent" is not true consent but rather the coerced compliance with a demand induced by the perpetrator's threat.  (See *People v. Goodman* (1958) 159 Cal.App.2d 54, 61 [requisite consent is "coerced and unwilling"]; *People v. Goldstein* (1948) 84 Cal.App.2d 581, 586 ["The victim of an extortioner might openly consent to the taking of his money 'and yet protest in his own heart' against its being taken."]; see also CALCRIM No. 1830 ["Consent for extortion can be coerced or unwilling, as long as it is given as a result of the wrongful use of force or fear"].)

Relying on *Torres, supra,* 33 Cal.App.4th at page 52, footnote 7, Defendant contends that robbery necessarily "involves an immediate threat, while extortion is commonly based on a threat of future harm."  To the extent that the dicta in *Torres*

other person consented to give the defendant money or property; and 4. As a result of the threat or use of force, the other person then gave the defendant money or property."

8

might be read as creating such a bright-line distinction, we respectfully disagree.

While extortion may "commonly" involve a threat of future harm, the statute does not so require. Section 518 does not prescribe a minimum opportunity for the victim to "consent" to avoid the harm threatened. And, as the "consent" is not actual consent but coerced capitulation, we see no reason to distinguish between threats of immediate harm, that leave little time to the victim to consider his options, and threats of far-off harm, that offer more time for reflection. Indeed, the more immediate the threat, the more likely it is to prompt compliance, strengthening the inference that the perpetrator sought to induce the victim's "consent" within the meaning of section 518.[3]

---

[3] The *Torres* court relied on more than just the immediacy of the threat in rejecting the defendant's argument that he had attempted only extortion, and not robbery, in demanding money before shooting his victim in the head. It also considered the defendant's words ("give [me] the money 'now' or 'I [blow] your brains out' ") and corresponding actions (simultaneously grabbing the victim by the hair and placing a gun to his head). (*Torres*, *supra*, 33 Cal.App.4th at pp. 51-52.) The court reasoned that, because the defendant displayed an "intent to take [his victim's] money by force or fear against his will," his actions "negate[d] the specific intent to obtain [the] money through consent, a necessary element of extortion." Threats that may appear as intent to take a victim's property by force do not necessarily negate the "consent" element for extortion purposes. Indeed, such threats may actually satisfy it. (See § 519, subd. 1. [fear used to obtain consent for extortion purposes may be induced by threat of unlawful injury to the victim].)

Just as section 518 does not limit extortion to threats of future harm, robbery is not limited to threats of immediate harm. Section 212 provides that robbery may be predicated on fear of either "1. [t]he fear of an unlawful injury to the property of the person robbed, or of any relative of his or member of his family; or 2. [t]he fear of an *immediate and* unlawful injury to the person or property of anyone in the company of the person robbed at the time of the robbery." (§ 212, italics added.) Because immediacy is required only for a feared injury to someone other than the victim or his relative, fear of a *future* harm to the victim or his relative can satisfy section 212 and support a robbery conviction.[4]

So understood, the differences between extortion and robbery become quite small where the perpetrator obtains property by inducing fear in his victim by threat of injury to the victim. We are not the first to recognize this. (See *People v. Ibrahim* (1993) 19 Cal.App.4th 1692, 1699 [noting the "subtle . . . distinction" between property taken consensually by force or fear (extortion), and property taken nonconsensually by force or fear (robbery)].); *People v. Kozlowski* (2002) 96 Cal.App.4th 853, 866 [noting "courts have sometimes found it

---

[4]     (See *People v. McGee* (2006) 38 Cal.4th 682, 716 ["[W]hen the prosecution seeks to establish the 'fear' element of robbery by reference to the fear sustained by a person who was in the company of the victim at the time of the robbery (*other than a relative of the victim*), the fear must be 'of an *immediate* and unlawful injury to the person or property' of the other person, as contrasted with Nevada's provision encompassing fear of future injury to the other person or his or her property."] italics added, overruled on other grounds in *People v. Gallardo* (2017) 4 Cal.5th 120, 134.)

difficult to distinguish these two offenses"].) Moreover, section 520 prescribes the sentencing for extortion "under circumstances not amounting to robbery . . . ." (§ 520.) There would be no need for this phrase unless there were factual circumstances where the prosecutor could have charged either extortion *or* robbery and chose extortion. Courts have recognized that while extortion is not necessarily included within the definition of robbery, there can be factual situations where extortion is a lesser included offense to robbery. (*In re Stanley E.* (1978) 81 Cal.App.3d 415, 420–421.)

Turning to the record evidence, we easily conclude that substantial evidence supported the jury's verdict on attempted extortion. For years, Defendant had collected a monthly "tax" from Reyes on the first of each month. Reyes dutifully paid this tax on demand. He did so out of fear Defendant would harm him or his family if he refused. There is no indication in the record that, prior to October 2, 2018, Defendant *did* resort to violence to collect money from Reyes.

When Defendant arrived at Reyes's house on October 2, he demanded of Reyes: "Where is my fuckin' money? Give me my fuckin' money or I'm going to kill you." Reyes interpreted this as a demand for the monthly "tax." This interpretation is bolstered by the fact that Reyes could not recall Defendant collecting the "tax" on October 1, the day prior, nor could he recall having borrowed money from Defendant, meaning that there was no other money which Defendant might claim as "his."

From this, a rational juror could conclude that Defendant came to Reyes's house to collect "his" monthly "tax" and that his threat was intended to cause Reyes to pay the money by consent, within the meaning of section 518, without actual resort to

11

violence and in accordance with the past practice of "consensual" payments.

When Reyes handed over just $5 instead of the usual $100, Defendant changed course. Defendant's statements to "Gloria" on a recorded jail telephone line reflect that he became infuriated by Reyes's failure to pay more. He explained: "He owed me $200 dollars [*sic*]. And I told him, 'Look fool. You're fucking with the wrong person, fool. I want my money.' He thought . . . he thought I was some lame or something. So I dropped him. I hit him as hard as I could. I buckled him and knocked out four teeth."[5] From this, a rational jury could conclude that Defendant first sought to obtain the money with Reyes's "consent," as he had done successfully for years, and only when that attempt failed did he decide to actually use the threatened force to attempt to obtain the money against Reyes's will. Substantial evidence therefore supports Defendant's conviction for attempted extortion.

## II.   The Trial Court Erred In Separately Punishing Defendant For The Two Assault Counts

In connection with his attack on Reyes, Defendant was properly convicted on both count 3, assault with a deadly weapon, and count 4, assault with force likely to produce great bodily injury. However, it was error to punish Defendant separately for these two offenses.

---

[5]   We note that Defendant's reference to "$200" does not indicate Defendant was referring to something other than the usual $100 "tax." Other exaggerations on the same call include that Defendant punched out "four" of Reyes's teeth (the actual damage was two) and that Reyes was "four feet" taller than Defendant.

Section 654 provides that "in no case shall [an act or omission that is punishable in different ways by different provisions of law] be punished under more than one provision." (§ 654, subd. (a).)  Because "[f]ew if any crimes . . . are the result of a single physical act," section 654 applies not just to a single " ' "act" in the ordinary sense . . . but also where a course of conduct violate[s] more than one statute . . . .' " (*Neal v. California* (1960) 55 Cal.2d 11, 19 (*Neal*), disapproved on another ground in *People v. Correa* (2012) 54 Cal.4th 331, 334.)  "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor.  If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Ibid.*; see also *People v. Harrison* (1989) 48 Cal.3d 321, 335 (*Harrison*).)

Importantly, where multiple acts evincing the same intent are sufficiently independent to reflect a renewal of such intent, section 654 is no bar to separate punishments.  (*Harrison*, *supra*, 48 Cal.3d at p. 338 [three identical acts of sexual penetration accomplished over the course of seven to 10 minutes separately punishable where they were interrupted by prolonged periods of struggle]; *People v. Trotter* (1992) 7 Cal.App.4th 363, 368 (*Trotter*) [three shots fired at pursuing police vehicle separately punishable where "separated by periods of time during which reflection was possible"].)

"Errors in the applicability of section 654 are corrected on appeal regardless of whether the point was raised by objection in the trial court or assigned as error on appeal." (*People v. Perez* (1979) 23 Cal.3d 545, 549, fn. 3.)  "Although the question of whether defendant harbored a 'single intent' within the meaning

13

of section 654 is generally a factual one, the applicability of the statute to conceded facts is a question of law." (*Harrison, supra,* 48 Cal.3d at p. 335.)

Here, the trial court identified but one objective for Defendant's acts of slashing at Reyes with a knife and punching him with his fist: a desire to seriously injure Reyes out of anger for his failure to pay defendant the full amount of his monthly "tax." As the trial court explained, the "vicious[] attack[] . . . with a knife and also with [Defendant's] fist . . . [occurred] simply because [Reyes] wasn't able to give [Defendant] the amount of money that [Defendant] felt he was entitled to . . . ."

This single objective is borne out by Reyes's testimony. Defendant's initial attempts to harm Reyes were with the knife, in each case directed to areas likely to cause severe injuries. The first four knife thrusts were at Reyes's stomach, which missed. The fifth was at Reyes's face, which Reyes blocked (sustaining a hand wound in the process). Unable to land a knife blow where intended, Defendant "swung again" with his fist, knocking out Reyes's teeth. The whole episode was "kind of like a fight" that ended after Defendant landed his devastating punch to Reyes's mouth.

Defendant's recitation of the incident during a prison call offers a condensed version of events but one that directly ties his anger about Reyes not paying the full "tax" to Defendant's ultimate satisfaction in seriously injuring Reyes with a blow to the face. Defendant felt angry and underestimated by Reyes when Reyes failed to pay the money: "he thought I was some lame or something. So I dropped him. I hit him as hard as I could. I buckled him and knocked out four teeth." Defendant's omission of his failed attempts to stab Reyes underscores that the

14

knife attack was merely an incident to his objective of harming Reyes in order to show that Defendant was the "wrong person" to "fuck[] with." To the extent Defendant even realized he had cut Reyes's hand in the course of the attack, it clearly did not satisfy Defendant's vicious urges to harm him. As soon as he landed a successful offensive strike—one that caused "all the blood [to] drain out"—Defendant relented.

Their assertion notwithstanding, the People identify no record evidence that Defendant's knife thrust to Reyes's face and punch to his mouth were "separated by periods of time during which reflection was possible." Rather, Reyes's testimony supports Defendant's characterization of the blows as a "classic 'one-two punch.' " After Reyes blocked the knife thrust with his hand, Defendant "swung again" with his fist. This happened quickly, as Reyes lamented that he was "too slow" to block the second blow to his face. Nowhere does Reyes indicate that there was any interruption between the blows sufficient for Defendant to reflect on his actions. Cases cited by the People in support of their "time for reflection" theory are therefore inapposite.[6]

---

[6] (See *People v. Lopez* (2011) 198 Cal.App.4th 698, 717-718 [criminal acts separated by drive to 7-Eleven]; *People v. Felix* (2001) 92 Cal.App.4th 905, 915-916 [threats made to different people at different times in different places]; *People v. Gaio* (2000) 81 Cal.App.4th 919, 935 [bribes occurring months apart]; *People v. Surdi* (1995) 35 Cal.App.4th 685, 687–688 [episodes of stabbing variously interrupted to buckle victim into seat belt, discuss abandonment of victim's body, and to drag victim from van to riverbed]; *Trotter*, *supra*, 7 Cal.App.4th at p. 368 [gunshots "separated by periods of time during which reflection was

Finally, while the trial court was correct that the two injurious blows involved "use[s] of force" that were "completely separate and distinct" in terms of physical motion, this is insufficient to support separate punishments. (*See Neal*, *supra*, 55 Cal.2d at p. 19 ["Few if any crimes . . . are the result of a single physical act," requiring courts to inquire into the entire course of conduct for section 654 purposes].) Nor does the fact that defendant used a knife to inflict one wound and a fist to inflict the other take the acts out of section 654's prohibition. (*Cf. Trotter*, *supra*, 7 Cal.App.4th at p. 368 & fn. 4 [single versus multiple instrumentalities of attack not dispositive]); *cf. People v. Johnson* (2007) 150 Cal.App.4th 1467, 1473-1474 [noting trial court imposed but one punishment for single continuous assault involving multiple blows and instrumentalities].) It is the absence of time between the slash and punch, notwithstanding the variation in instrumentalities used, that shows there was no reflection by Defendant on his conduct before he delivered the punch.

For these reasons, we vacate the aggregate three-year sentence, including related enhancements, imposed for Defendant's conviction on count 4, assault with force likely to produce great bodily injury. The trial court is directed to resentence Defendant on count 4 pursuant to our mandate in section IV, *infra*.

---

possible"]; *Harrison*, *supra*, 48 Cal.3d at p. 338 [acts of sexual penetration interrupted by prolonged periods of struggle].)

## III. The Trial Court Acted Within Its Discretion In Denying Appellant's *Romero*[7] Motion

"[A] court's failure to dismiss or strike a prior conviction allegation is subject to review under the deferential abuse of discretion standard." *People v. Carmony* (2004) 33 Cal.4th 367, 374 (*Carmony*).)  To show an abuse of discretion, the defendant must show that the trial court's decision was "so irrational or arbitrary that no reasonable person could agree with it." (*Id.* at p. 377.)  Accordingly, "a trial court will only abuse its discretion in failing to strike a prior felony conviction allegation in limited circumstances.  For example, an abuse of discretion occurs where the trial court was not 'aware of its discretion' to dismiss [citation], or where the court considered impermissible factors in declining to dismiss." (*Id.* at p. 378.)

Even when " 'a trial court has given both proper and improper reasons for a sentence choice, a reviewing court will set aside the sentence only if it is reasonably probable that the trial court would have chosen a lesser sentence had it known that some of its reasons were improper.' [Citation.]" (*People v. Leonard* (2014) 228 Cal.App.4th 465, 503 (*Leonard*).)

A trial court deciding, or appellate court reviewing the decision, whether to strike a prior felony conviction allegation under section 1385, subdivision (a), "must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the

---

[7]     *People v. Superior Court* (*Romero*) 13 Cal.4th 497.

17

defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams* (1998) 17 Cal.4th 148, 161 (*Williams*).) "[T]he circumstances must be 'extraordinary . . . by which a career criminal can be deemed to fall outside the spirit of the very scheme within which he squarely falls . . . .' " (*Carmony*, *supra*, 33 Cal.4th at p. 378.) As such, in reviewing the trial court's decision, "the circumstances where no reasonable people could disagree that the criminal falls outside the spirit of the three strikes scheme must be even more extraordinary." (*Ibid.*)

Here, the trial court gave primary weight to Defendant's extensive criminal history. His chain of offenses from 1991 through and including the Spadra Cemetery and Reyes incidents—which occurred just 16 days apart—reflect a career criminal who is unable to remain out of prison for more than a few years at a time. Indeed, in the 27 years between his prior strike and his commission of his latest offenses, Defendant had been incarcerated four times pursuant to sentences totaling nearly 17 years for various felonies, including violent crimes and firearm violations. The trial court did not abuse its discretion in concluding that Defendant falls within "the spirit of" the Three Strikes law. (Cf. *People v. Mantanez* (2002) 98 Cal.App.4th 354, 366 [10 felony convictions resulting in four separate prison terms and multiple parole violations over 17-year period brought defendant "squarely within the Three Strikes ambit"].)

Defendant does not argue that considering his criminal history was improper. However, he does imply that the trial court erred by referring to that history as "controlling." As Defendant acknowledges, this statement can be interpreted as

18

the trial court's identification of the factors it relied on most heavily in conducting the analysis prescribed by *Williams*, as opposed to a perceived limit on its discretion. Indeed, this is the only possible interpretation given that the trial court correctly identified the *Williams* factors and made a deliberate record addressing them.

Defendant next takes issue with certain of the other factors the trial court considered. He argues that the trial court gave "significant weight to factors that were not supported by the testimony at trial or in the probation report," namely that (i) Reyes was a "developmentally disabled adult"; (ii) Defendant "extorted" Reyes for three years before the date of the charged crimes and had already benefitted from leniency in the prosecutor's decisions not to charge those prior acts; and (iii) Defendant endangered Chapa and influenced his testimony by disseminating Chapa's address to other gang members. While the trial court's articulation of these considerations may have been imprecise in some respects, we find no error in its denial of Defendant's *Romero* motion.

### A. *Consideration Of Reyes's Mental Capacity*.

Whether or not Reyes fit a specific definition of "developmentally disabled adult," there was ample evidence that Reyes's level of cognitive function rendered him particularly vulnerable to Defendant's exploitation. The record further reflects that Defendant recognized Reyes's vulnerability and did, in fact, exploit it. The trial court did not err in deeming this conduct "reprehensible" in considering appropriate punishment for Defendant's conduct.

Reyes's preliminary hearing testimony provides ample basis on which to conclude he had a mental disability. For

example, he could not come up with the word for "street" on his own and spelled the name "Huero" "W-E-O-E." He also demonstrated confusion about the nature of his relationship with Defendant[8] and exceptional credulity in accepting the premise of Defendant's "tax" scheme. Moreover, Defendant's girlfriend thought Reyes "seemed" "mentally disabled" and Defendant referred to Reyes in prison calls as an "idiot" and a "fool."[9] And, as was well known to Defendant, Reyes was an SSI beneficiary— a program that benefits, among others, the disabled.

Substantial evidence supports the conclusion that Defendant exploited a victim made especially vulnerable by his mental disability, and the trial court properly considered this in evaluating the *Williams* factors.

---

[8] Reyes testified Defendant had been "taxing" him "since the first time I met him, about six years." Nonetheless, Reyes still perceived Defendant as a "friend." Reyes and Defendant's purported "friendship" lasted until the date that Reyes failed to pay the monthly "tax," when Defendant viciously attacked Reyes. Defendant attempts to characterize the $100 monthly "tax" Reyes paid to Defendant as a fair exchange for Defendant's "friendship" and part of a "symbiotic" relationship. To the extent this characterization is reasonable at all, it is by no means the only reasonable interpretation of the evidence.

[9] Defendant appears to be deliberate with his descriptors of others. For example, he referred to the 26 year old Chapa as a "kid" but consistently referred to Reyes, who was also a large man, as a "fool," "idiot," or "fat."

20

**B. Defendant's Prior "Extortion" Of Reyes And Lack Of Charges.**

Defendant contends that the trial court should not have characterized his historical "tax" scheme as extortion nor considered the lack of charges for that scheme in ruling on his *Romero* motion. In support, Defendant quotes *People v. Avila* (2020) 57 Cal.App.5th 1134, 1142 (*Avila*) for the proposition that "[r]uling on a *Romero* motion requires consideration of the nature and circumstance of the crime actually committed, not a crime that might have occurred." (*Ibid*.) This quote was directed at speculation by the trial court about what further acts the defendant *might have* committed *but for* police intervention. (*Ibid*.) No such speculation occurred here.

In referring to Defendant's prior "extortion" of Reyes, the trial court was referring to testimony from Reyes that, out of fear that Defendant would harm him or hurt his family, he paid Defendant $100 out of his SSI benefits on the first of each month for six years. Whether or not this constituted extortion within the meaning of section 518, and whether or not it was charged, the trial court was entitled to consider Defendant's prior behavior evident in the record in considering the *Williams* factors. The trial court's reference to what additional charges Defendant might have faced for this conduct simply underscores the seriousness of the conduct as weighing against a sentence mitigation, not an effort to punish an unproven crime. It was not necessary for the trial court to have insight into the People's charging decisions to use the substantial evidence of Defendant's conduct in this way.

### C. *Witness Intimidation*.

The trial court properly considered Defendant's efforts to discourage testimony of witnesses to his September and October 2018 crimes. In discussing this, the court began with Defendant's efforts to prevent Reyes from testifying. These efforts are clearly reflected in Defendant's recorded jailhouse calls. It then turned to Defendant's efforts to intimidate Chapa. The court noted that Defendant had photographed Chapa's ID and placed Chapa's "safety in danger by distributing his address to fellow gang members . . . ."[10] The court then concluded that Defendant successfully chilled Chapa's testimony through these actions.

Defendant argues that the record does not support the finding that, by sharing Chapa's Brea Canyon Road address with fellow gang members, Defendant endangered Chapa and chilled his testimony, because Chapa no longer lived at the Brea Canyon Road address at the time of trial. Defendant's reading of the trial court's reasoning is too narrow.

First, substantial evidence supports the conclusion that Defendant endangered Chapa by distributing his name to fellow gang members. Although Chapa no longer lived on Brea Canyon Road at the time of the September of 2019 trial, he did live there at the time of the robbery in September of 2018. Although the record does not reflect the date on which Chapa moved, the trial court could reasonably deduce that Defendant's efforts to

---

[10] The trial court's reasoning is somewhat fractured by Defendant's repeated interruptions on the record but its overall analysis is sufficiently clear for purposes of our review.

22

disseminate his address (as well as Chapa's name) to gang members shortly after the robbery endangered Chapa.

About six weeks after the robbery, Defendant told "Mundo" that "this shit will all go away . . . because [my hyna[11]] has all the information to where these people are." He instructed "Mundo" to bail out his "hyna" who "knows where this kid's at." He continued, "[c]all my sister and tell her . . . Huero wants me to get this girl out and my sister knows already what time it is. My sister has the card, fuckin', and like it [*sic*] told you. Just get my hyna out. This shit will all go away baby boy."[12] About a month later, Defendant gave Chapa's address to "Sis," who gave it to "Cuba." Defendant then told "Cuba" to give it to "Gilly," and to "tell Gilly I says fucking . . . you know what I mean. Tell Gilly I said fuckin' do me that favor. Okay?"

Defendant appears to be contending that there was no basis to conclude Defendant endangered Chapa if the address given by Defendant was no longer current. But nowhere did Defendant limit his directives to a single address. It was clearly implicit that he wanted his associates to find Chapa, and not to

---

[11]     From the context, we infer that Defendant's references to "my hyna" are to Gorostiza. The term "hyna" implies a female and Defendant's requests for help in bailing "his hyna" out make clear he is referring to his girlfriend and co-defendant who was arrested with him.

[12]     Notably, Defendant had recently told "Sis" to suggest conforming testimony to witnesses to both the Spadra and Reyes incidents. His instructions were so explicit that she warned him he was implicating her in a crime by giving them to her.

look for him at a single address and then give up if he had moved. Giving the last known address for someone is normally helpful in tracking down their current whereabouts. Current occupants and neighbors can be asked (or intimidated into revealing) if they know the new address, or if mail is being forwarded. The trial court was not mistaken in relying on Defendant's giving of Chapa's last known address as supporting the conclusion Defendant was trying to intimidate Chapa and endangering his safety.

Taken together, there is substantial evidence that Defendant directly and indirectly provided fellow gang members Chapa's address with the intention that they use that information to intimidate Chapa for the purpose of influencing his testimony. Notwithstanding his argument that "[Defendant] did not tell anyone to intimidate Jeremy Chapa," the record supports the conclusion that his thinly coded messages put Chapa's safety at risk.

There is also substantial evidence that Chapa *was* intimidated by Defendant's threats, from which the trial court could conclude that his testimony was influenced. Chapa testified that, when speaking to the police shortly after the crime, he was frightened about Defendant's threats and that Defendant had his address, and further testified that he remained frightened at the time of trial.

Even if Defendant were correct that the trial court had erred in finding that Defendant endangered Chapa and chilled his testimony by sharing the Brea Canyon Road address with gang associates, our conclusions would not change. It is not reasonably probable that the court would have chosen a lesser sentence but for any such alleged error. The trial court expressed

grave concerns about Defendant's "numerous attempts to unlawfully prevent or dissuade witnesses from testifying," calling it "a common theme across this entire case." Defendant's dissemination of Chapa's address to fellow gang members was but one part of his scheme to interfere with the judicial process.[13] If Chapa's former address were viewed as irrelevant, that one factor was not critical to the trial court's overall sentencing choices, and therefore any error would be harmless. (*Leonard, supra*, 228 Cal.App.4th at p. 503.)

Finally, Defendant argues that the trial court erred in failing to consider that he was just 19 at the time of his 1991 first strike. For this proposition, Defendant relies on *Avila, supra*, wherein the court found error in the trial court's determination that it was *prohibited* from considering the factor of age in deciding a *Romero* motion. (*Avila, supra*, 57 Cal.App.5th at p. 1142.) As an initial matter, the trial court here *did* consider Defendant's first strike was in 1991, and inherent in that consideration is that Defendant was nearly 30 years younger at the time. In any event, *Avila* does not *mandate* consideration of a

---

[13]    The trial court would also have been aware of the evidence presented that Defendant also endangered *Reyes's* safety when, three days after Reyes testified at the preliminary hearing, Defendant told "Julian" to "talk to Gilly ASAP and let him know what that fool [Reyes] did [testified], homie. And let him know, fuckin', you know what I mean. I said talk to Diablo." Various recorded calls reflect that Defendant's associates knew where Reyes lived and "Julian," "Gilly," and "Diablo" could easily have interpreted Defendant's message as an instruction to take retributive action against Reyes for giving testimony against Defendant.

defendant's age at the time of a first strike; it simply identifies such age as potentially relevant. By identifying broad categories of information—"the nature and circumstances of [the defendant's] present felonies and prior serious and/or violent felony convictions, and the particulars of [the defendant's] background, character, and prospects" (*Williams*, *supra*, 17 Cal.4th at p. 161)—as the factors relevant to the *Romero* analysis, *Williams* gives trial judges substantial leeway in determining the most significant facts in each case. We find no basis to conclude that the trial court misapplied *Williams* or otherwise abused its discretion in denying Defendant's *Romero* motion.

## IV. Remand For Resentencing To Exercise Discretion In Light Of Recent Amendments To The Penal Code

At a sentencing hearing in May of 2020, the trial court purported to strike certain prior felonies that would otherwise have resulted in an enhancement under section 667.5, subdivision (b), as was in effect prior to January 1, 2020. However, such felonies no longer qualified for enhancement under section 667.5 as in effect at the time of the hearing. Though the court reached the right result, the record indicates that it believed doing so was discretionary rather than mandatory.

In addition, pursuant to Assembly Bill No. 518 (AB 518), section 654 was amended on January 1, 2022 to give trial courts discretion in selecting the punished offense for conduct

punishable under multiple provisions of law.[14]  Under existing law, section 654 dictates punishment based on the offense for which the longest prison term is prescribed.  Here, applying current section 654, the trial court selected count 3, assault with a deadly weapon in violation of section 245, subdivision (a)(1), as the punishable offense subject to section 654 in relation to the Reyes incident.  Under amended section 654, the trial court would have had discretion to select count 1 or count 2 (or, for the reasons stated in section II, *supra*, count 4) as the punishable offense.

Defendant raised the effect of AB 518 by supplemental brief, to which the People filed a response.  The People urge that remand to consider the effect of AB 518 is unnecessary as the trial court evinced an intent to "impose the maximum possible sentence as to [Defendant's] offenses against Reyes."  Given that the trial court purported to exercise discretion in a manner beneficial to Defendant with respect to section 667.5, subdivision (b)—a matter outside of the court's discretion—we cannot agree that the record is sufficiently clear to render remand a meaningless exercise.

The trial court should have the opportunity exercise its discretion anew in light of the recent changes to the Penal Code. We therefore remand for resentencing on all counts.

---

[14]  Defendant is entitled to the benefit of any amendment to applicable sentencing laws occurring before his judgment becomes final.  (*People v. Vieira* (2005) 35 Cal.4th 264, 306.)

## DISPOSITION

The judgment is affirmed in part, vacated in part, and remanded in part.

**CERTIFIED FOR PUBLICATION**


HARUTUNIAN, J.*

We concur:


STRATTON, Acting P. J.


WILEY, J.

---

\*     Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.